UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK RUBENSTEIN,<br><br>                              Plaintiff,<br><br>                         -v.-<br><br>KNIGHT-SWIFT TRANSPORTATION HOLDINGS INC.,<br><br>                              Nominal Defendant,<br><br>JERRY C. MOYES and VICKIE MOYES,<br><br>                              Defendants. | 19 Civ. 7802 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

Plaintiff Mark Rubenstein brings this shareholder suit to enforce the "short swing" profit recovery provisions of Section 16(b) of the Securities Exchange Act of 1934, as amended (the "Act"), 15 U.S.C. § 78p(b).  He alleges that Defendants Jerry C. Moyes and Vickie Moyes (together, the "Moyes Defendants"), beneficial owners of more than 10% of Knight-Swift Transportation Holdings Inc. ("Knight-Swift" or the "Company"), violated Section 16(b) by buying and selling Knight-Swift common stock in two distinct ways within a six-month period.  The Moyes Defendants moved to dismiss on the grounds that Plaintiff, as to his first Section 16(b) claim, did not adequately plead a purchase transaction, and as to his second Section 16(b) claim, did not adequately plead that the Moyes Defendants realized a profit.  For the reasons explained below, the Moyes Defendants' motion to dismiss is granted in part and denied in part.

# BACKGROUND[1]

## A.    Factual Background

### 1.    The Parties

Plaintiff owns securities in Knight-Swift, a publicly traded company whose shares are listed on the New York Stock Exchange.  (Compl. ¶¶ 2, 3).  The Moyes Defendants, through various entities, including Cactus Holding Company LLC ("Cactus I"), Cactus Holding Company II, LLC ("Cactus II"), and M Capital II, beneficially owned 40.8 million shares of common stock of Knight-Swift as of October 21, 2018, which represented 23.4% of the Company's outstanding shares.  (*Id.* at ¶ 5; Leiwant Decl., Ex. F).  For purposes of this motion, there is no dispute that during all relevant times, the Moyes Defendants beneficially owned over 10% of Knight-Swift's shares.  (Compl. ¶ 5; Def. Br. 2).

### 2.    The December 2018 to February 2019 Transactions (Claim I)

In Claim I, Plaintiff alleges that three transactions undertaken by the Moyes Defendants (in part through Cactus I and Cactus II), between December 21, 2018, and February 13, 2019, give rise to liability under Section 16(b).  To provide context for these and other transactions challenged

---

[1]    The facts in this Opinion are drawn primarily from Plaintiff's First Amended Complaint ("Complaint" or "Compl." (Dkt. #25)), which is the operative pleading in this case; as well as the Declaration of Molly L. Leiwant ("Leiwant Decl." (Dkt. #29) and its attached exhibits; the Affirmation of Miriam Tauber ("Tauber Aff." (Dkt. #36)) and its attached exhibits; and the Reply Declaration of Molly L. Leiwant ("Leiwant Reply Decl." (Dkt. #41)) and its attached exhibits.

For ease of reference, the Court refers to the Moyes Defendants' opening brief as "Def. Br." (Dkt. #28); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #35); and the Moyes Defendants' reply brief as "Def. Reply" (Dkt. #40).

by Plaintiff, the Court briefly discusses the vehicles through which the transactions were accomplished.

### a.   The Partial Termination of the Early Repo

As of November 16, 2017, Cactus II owned or held ownership claims to 4,868,208 shares of the common stock of Knight-Swift. (Compl. ¶ 6). Those shares were sold to an unrelated counterparty, Citigroup Global Markets, Inc. ("CGMI"), pursuant to a Securities Sale and Repurchase Agreement (the "Early Repo"), in exchange for a cash payment advanced to Cactus II. (*Id.*).[2] Under the Early Repo, Cactus II maintained a full recourse obligation to repurchase the securities in exchange for a minimum payment by Cactus II equal to the total amount advanced to Cactus II under the Early Repo. (*Id.*). The Moyes Defendants, through Cactus II, had the power to repurchase the shares subject to the Early Repo at any time. (*Id.*). As of December 21, 2018, CGMI had advanced a total of $125 million to Cactus II under the Early Repo, which was

---

[2]    A typical repurchase transaction, or "repo," involves a sale of securities, which the parties agree will be repurchased by the seller from the buyer at a pre-determined time and price. At the inception of the repo, the purchaser pays the seller, in full, for the shares. Full title to the shares is transferred directly to the purchaser. The shares may immediately be sold, pledged, or otherwise disposed of by the purchaser; they are not deposited as collateral against the seller's possible default. *See generally Granite Partners, L.P.* v. *Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 300 (S.D.N.Y. 1998); *see also In re Lehman Bros. Inc.*, No. 08-01420 (SCC), 2015 WL 7451411, at *4 (Bankr. S.D.N.Y. Nov. 23, 2015).

A key point of dispute as to Claim I is whether the Moyes Defendants engaged in two repurchase transactions (whether actual or deemed) in December 2018, as Plaintiff claims, or a single repurchase transaction that was merely amended in December 2018, as the Moyes Defendants claim. The Court adopts Plaintiff's nomenclature for the Factual Background section, recognizing the procedural context in which the instant motion to dismiss arises, but the dispute is addressed in greater detail *infra*.

also the corresponding minimum repurchase price to be paid by Cactus II for the 4,868,208 shares of common stock subject to the Early Repo.  (*Id.* at ¶ 7).

On December 21, 2018, the Early Repo was partially terminated when Cactus II and CGMI agreed that CGMI would sell 1,537,205 of the 4,868,208 shares subject to the Early Repo.  (Compl. ¶ 13).  Simultaneous with the partial termination of the Early Repo, Cactus II and CGMI undertook to amend the Early Repo (referred to by Plaintiff as the "New Repo"), as it pertained to the remaining 3,331,003 shares.  (*Id.* at ¶ 14).[3]  Under the New Repo: (i) the repurchase price was reduced by $37,612,793, (ii) the number of shares subject to the New Repo was reduced to 3,331,003; and (iii) the per-share repurchase price, in consequence of (i) and (ii), was increased from $25.68 to $26.23.  (*Id.*).

### b.   The December 2018 Open Market Sale

On December 27, 2018, less than one week after the New Repo transaction, Cactus II sold a total of 1,173,680 shares of Knight-Swift common stock to the Company.  (Compl. ¶ 16).  Cactus II reported receiving a total

---

[3]   The Early Repo permitted the Defendants to terminate the agreement (or accelerate settlement) by paying the repurchase price on any selected "Early Termination" date. (*See* Tauber Aff., Ex. 2 ¶ 2.8).  Because the market price of the underlying shares was lower than the repurchase price on the date of the partial cancellation, a true partial cash settlement would have required the Moyes Defendants to pay CGMI an amount equal to the difference between the market price and the proportional repurchase price for the canceled shares.  Plaintiff's brief explains that instead of paying CGMI outright, the cash settlement amount owed by the Defendants in connection with the partial termination was included within the total amount owed by the Defendants as their repurchase price for the 3,331,003 shares that the Moyes Defendants remained obligated to repurchase.  (*See* Pl. Opp. 15-16).

payment of $29,318,526.40 for the shares, which is equivalent to a per-share sale price of $24.98.  (*Id.*).

###    c.    The February 2019 VPF Transaction

On February 13, 2019, Cactus II terminated the New Repo by re-acquiring the 3,331,003 shares subject to the New Repo, and paying the New Repo purchase price of $87,387,207 (*i.e.*, the Early Repo price of $125 million purchase, as reduced by $37,612,793 under the New Repo transaction). (Compl. ¶ 17).  Following the termination of the New Repo, the Moyes Defendants directed Cactus II to distribute the 3,331,003 shares to Cactus I, and Cactus I immediately entered into a variable pre-paid share forward contract ("VPF")[4] covering the 3,331,003 shares distributed.  (*Id.*).

The VPF executed by Cactus I on February 13, 2019, obligated Cactus I to sell a maximum of 3,331,003 shares of Knight-Swift stock to Cactus I's VPR counterparty, CGMI.  (Compl. ¶ 18).  The shares were to be sold in varying "component" amounts, on dates between August 30 and September 4, 2019, at

---

[4]    A variable pre-paid share forward contract or VPF:

> obligates the seller to sell, and the counterparty (usually a broker-dealer) to purchase, shares of issuer stock on a specified date in the future....  At the time of execution of the contract neither the number of shares that will be deliverable upon settlement nor the price per share of the securities to be delivered is known.  Instead, the contract specifies (i) a maximum number of shares that may become deliverable under the contract (the 'covered shares') and (ii) a fixed aggregate price payable for the shares ultimately delivered at settlement.

Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide § 3.03, at 263 (4th ed. 2012).

prices to be determined subject to the formula prescribed by the VPF contract. (*Id.*).

### 3. The August to September 2019 Transactions (Claim II)

In Claim II, Plaintiff alleges that the Moyes Defendants' amendments of various VPFs — including the February 13, 2019 VPF identified in Claim I — in August and September 2019 constituted purchases and sales of Knight-Swift common stock in violation of Section 16(b).  (*See* Compl. ¶ 41).  The amendments at issue are discussed in the remainder of this section.

#### a. The August 2019 VPF Amendments

On August 23, 2019, the Moyes Defendants terminated or amended certain outstanding VPF contracts that had been previously entered into between them and CGMI, and entered into new VPF contracts with CGMI, covering the same number of shares as the terminated contracts, but with extended "valuation" or settlement dates and revised pricing.  (Compl. ¶ 21).

The Moyes Defendants amended the VPF contract originally entered into through Cactus I on February 13, 2019, covering 3,331,003 shares to: (i) extend the valuation dates from August 30, 2019, through September 3, 2019, to May 26, 2020, through May 28, 2020; and (ii) increase the "Floor" and "Cap" prices by which the number of shares to be delivered by the Moyes Defendants was to be determined on the relevant valuation dates.  (Compl. ¶ 22).  The Floor Price was increased from $35.9841 to $42.00; and the Cap Price was increased from $42.9762 to $52.25.  (*Id.*).  The maximum number of

6

shares to be delivered under the amended VPF contract remained unchanged at 3,331,003.  (*Id.*).

The Moyes Defendants, through Cactus I, also amended an outstanding VPF contract covering a maximum of 2,376,000 shares to: (i) extend the valuation dates from August 30, 2019, through September 4, 2019, to May 26, 2020, through May 28, 2020; and (ii) increase the "Floor" and "Cap" prices by which the number of shares to be delivered by the Moyes Defendants was to be determined on the relevant valuation dates.  (Compl. ¶ 23).  The Floor Price was increased from $39.9687 to $42.50; and the Cap Price was increased from $47.9451 to $52.95.  (*Id.*).  The maximum number of shares to be delivered by the Moyes Defendants under the amended VPF contract remained unchanged at 2,376,000.  (*Id.*).

The Moyes Defendants, through Cactus I, also amended an outstanding VPF contract covering a maximum of 5,044,308 shares to: (i) extend the valuation dates from August 30, 2019, through September 4, 2019, to March 13, 2020, through March 17, 2020; and (ii) increase the "Floor" and "Cap" prices by which the number of shares to be delivered by the Moyes Defendants was to be determined on the relevant valuation dates.  (Compl. ¶ 24).  The Floor Price was increased from $40.9682 to $44.50; and the Cap Price was increased from $49.1983 to $56.50.  (*Id.*).  The maximum number of shares to be delivered by the Moyes Defendants under the amended VPF contract remained unchanged at 5,044,308.  (*Id.*).

The Moyes Defendants, through M Capital II, also amended an outstanding VPF contract covering a maximum of 9,864,000 shares to: (i) extend the valuation dates from August 30, 2019, through September 27, 2019, to May 26, 2020, through June 22, 2020; and (ii) increase the "Floor" and "Cap" prices by which the number of shares to be delivered by the Moyes Defendants was to be determined on the relevant valuation dates.  (Compl. ¶ 25).  The Floor Price was increased from $39.9687 to $42.50; and the Cap Price was increased from $47.9451 to $52.95.  (*Id.*).  The maximum number of shares to be delivered by the Moyes Defendants under the amended VPF contract remained unchanged at 9,864,000.  (*Id.*).

The Moyes Defendants, through M Capital II, also amended an outstanding VPF covering a maximum of 8,851,962 shares to: (i) extend the valuation dates from August 30, 2019, through September 27, 2019, to March 13, 2020, through April 9, 2020; and (ii) increase the "Floor" and "Cap" prices by which the number of shares to be delivered by the Moyes Defendants was to be determined on the relevant valuation dates.  (Compl. ¶ 26).  The Floor Price was increased from $40.9682 to $44.50; and the Cap Price was increased from $49.1983 to $56.50.  (*Id.*).  The maximum number of shares to be delivered by the Moyes Defendants under the amended VPF contract remained unchanged at 8,851,962.  (*Id.*).

### b.   The September 2019 VPF Amendments

On September 10, 2019, the Moyes Defendants elected to amend the August 23, 2019 VPF contracts pursuant to a Trigger Price Agreement executed

8

by the Moyes Defendants and CGMI in connection with the August 23, 2019 VPF contract amendments. (Compl. ¶¶ 32, 38). The Trigger Price Agreement provided the Moyes Defendants with the right to amend the pricing of the VPF contracts, which right was triggered by the market trading price of the underlying Knight-Swift common stock. (*Id.* at ¶ 38). Upon electing their "triggered" right to amend the VPF contracts, the Moyes Defendants were required to make "commercially reasonable" payment to CGMI in the amount of $6,500,000. (*Id.*).

The Moyes Defendants amended the VPF contract that had originally been entered into through Cactus I on February 13, 2019, and amended on August 23, 2019, covering 3,331,003 shares to: (i) extend the valuation dates from May 26, 2020, through May 28, 2020, to June 10, 2020, through June 12, 2020; and (ii) increase the "Floor" and "Cap" prices by which the number of shares to be delivered by the Moyes Defendants was to be determined on the relevant valuation dates. (Compl. ¶ 33). The Floor Price was increased from $42.00 to $43.20; and the Cap Price was increased from $52.25 to $53.25. (*Id.*). The maximum number of shares to be delivered under this VPF contract remained unchanged at 3,331,003. (*Id.*).

The Moyes Defendants, through Cactus I, amended their outstanding VPF contract covering a maximum of 2,376,000 shares to: (i) extend the valuation dates from May 26, 2020, through May 28, 2020, to June 10, 2020, through June 12, 2020; and (ii) increase the "Floor" and "Cap" prices by which the number of shares to be delivered by the Moyes Defendants was to be

determined on the relevant valuation dates.  (Compl. ¶ 34).  The Floor Price was increased from $42.50 to $43.70; and the Cap Price was increased from $52.95 to $54.15.  (*Id.*).  The maximum number of shares to be delivered by the Moyes Defendants under this VPF contract remained unchanged at 2,376,000. (*Id.*).

The Moyes Defendants, through Cactus I, amended their outstanding VPF contract covering a maximum of 5,044,308 shares to increase the "Floor" and "Cap" prices by which the number of shares to be delivered by the Moyes Defendants was to be determined on the relevant valuation dates.  (Compl. ¶ 35).  The Floor Price was increased from $44.50 to 45.50; and the Cap Price was increased from $56.50 to $58.25.  (*Id.*).  The valuation dates of March 13, 2020, through March 17, 2020, for this VPF remained unchanged; and the maximum number of shares to be delivered by the Moyes Defendants under this VPF contract remained unchanged at 5,044,308.  (*Id.*).

The Moyes Defendants, through M Capital II, amended their outstanding VPF contract covering a maximum of 9,864,000 shares to: (i) extend the valuation dates from May 26, 2020, through June 22, 2020, to June 10, 2020, through July 8, 2020; and (ii) increase the "Floor" and "Cap" prices by which the number of shares to be delivered by the Moyes Defendants was to be determined on the relevant valuation dates.  (Compl. ¶ 36).  The Floor Price was increased from $42.50 to 43.70; and the Cap Price was increased from $52.95 to $54.15.  (*Id.*).  The maximum number of shares to be delivered by the

Moyes Defendants under the amended VPF contract remained unchanged at 9,864,000.  (*Id*.).

The Moyes Defendants, through M Capital II, amended their outstanding VPF covering a maximum of 8,851,962 shares to increase the "Floor" and "Cap" prices by which the number of shares to be delivered by the Moyes Defendants was to be determined on the relevant valuation dates.  (Compl. ¶ 37).  The Floor Price was increased from $44.50 to $45.50; and the Cap Price was increased from $56.50 to $58.25.  (*Id*.).  The valuation dates of March 13, 2020, through April 9, 2020, for this VPF remained unchanged; and the maximum number of shares to be delivered by the Moyes Defendants under the amended VPF contract remained unchanged at 8,851,962.  (*Id*.).

## B.   Procedural History

Plaintiff filed the original complaint in this action against the Moyes Defendants and Nominal Defendant Knight-Swift on August 20, 2019.  (Dkt. #1).  On October 21, 2019, Knight-Swift filed an answer to the original complaint and the Moyes Defendants filed a letter seeking a conference in anticipation of filing a motion to dismiss.  (Dkt. #18, 19).  On October 24, 2019, Plaintiff responded to the Moyes Defendants' letter suggesting a schedule for the filing of an amended complaint and briefing on the Moyes Defendants' anticipated motion to dismiss.  (Dkt. #20).  On October 29, 2019, both Knight-Swift and the Moyes Defendants consented to Plaintiff's filing an amended complaint.  (Dkt. #22).  At that time, the Court set a briefing schedule.  (Dkt. #24).

Plaintiff filed his amended complaint (the "Complaint") on November 11, 2019.  (Dkt. #25).  Knight-Swift filed an answer to the Complaint on December 13, 2019.  (Dkt. #26).  The Moyes Defendants filed their motion to dismiss and supporting declaration the same day.  (Dkt. #27-29).  Plaintiff filed his brief and affirmation in opposition to the motion to dismiss on January 24, 2020.  (Dkt. #35-36).  The Moyes Defendants filed their reply brief and declaration on February 7, 2020.  (Dkt. #40-41).  Accordingly, the Moyes Defendants' motion to dismiss is ripe for review.

## DISCUSSION

**A.    Applicable Law**

**1.    Motions to Dismiss Under Rule 12(b)(6)**

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  (internal quotation marks omitted)).  In addition to the text of the complaint, a court may consider documents attached as exhibits, incorporated by reference, or that are "integral" to the complaint, as well as public filings of which judicial notice may be taken.  *See Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir.

12

2016); *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  A

plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief

that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570

(2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir.

2007) ("While *Twombly* does not require heightened fact pleading of specifics, it

does require enough facts to nudge plaintiff's claims across the line from

conceivable to plausible." (internal quotation marks omitted) (citing *Twombly*,

550 U.S. at 570)).

That said, a court is not bound to accept "conclusory allegations or legal

conclusions masquerading as factual conclusions."  *Rolon* v. *Henneman*, 517

F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted); *see*

*also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must

accept as true all of the allegations contained in a complaint, that tenet is

inapplicable to legal conclusions, and threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice."

(internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)).  Moreover,

"[w]here a complaint pleads facts that are 'merely consistent with' a defendant's

liability, it 'stops short of the line between possibility and plausibility of

entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

557).

## 2.    Section 16(b) of the Exchange Act

Section 16(b) states in relevant part:

> For the purpose of preventing the unfair use of
> information which may have been obtained by [a

13

> corporate insider] by reason of his relationship to the
> issuer, any profit realized by [the insider] from any
> purchase and sale, or any sale and purchase, of any
> equity security of such issuer ... within any period of
> less than six months ... shall inure to and be
> recoverable by the issuer, irrespective of any intention
> on the part of [the insider].

15 U.S.C. § 78p(b).  Section 16(b), "a vital component of the Exchange Act, []
was designed to prevent an issuer's directors, officers, and principal
stockholders from engaging in speculative transactions on the basis of
information not available to others."  *Donoghue* v. *Bulldog Invs. Gen. P'ship*,
696 F.3d 170, 173-74 (2d Cir. 2012) (internal quotation marks omitted).  It was
created as a "blunt instrument" to impose a form of strict liability, requiring no
showing of actual misuse of inside information or of unlawful intent.  *Id.* at
174.

　　To state a plausible claim under Section 16(b), a plaintiff must plead
facts sufficient to show "that there was [i] a purchase and [ii] a sale of
securities [iii] by an insider [iv] within a six-month period."  *Chechele* v.
*Sperling*, 758 F.3d 463, 467 (2d Cir. 2014) (quoting *Gwozdzinsky* v.
*Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998)); *Feder* v. *Frost*, 220
F.3d 29, 32 (2d Cir. 2000).  "The statutory definitions of 'purchase' and 'sale'
are broad and, at least arguably, reach many transactions not ordinarily
deemed a sale or purchase."  *Kern County Land Co.* v. *Occidental Petroleum
Corp.*, 411 U.S. 582, 593-94 (1973); *see id.* at 594 ("In deciding whether
borderline transactions are within the reach of the statute, the courts have
come to inquire whether the transaction may serve as a vehicle for the evil

which Congress sought to prevent — the realization of short-swing profits based upon access to inside information — thereby endeavoring to implement congressional objectives without extending the reach of the statute beyond its intended limits."); *see also Olagues* v. *Perceptive Advisors LLC*, 902 F.3d 121, 128-29 (2d Cir. 2018) ("And when we construe Section 16(b) in relation to complex transactions and derivative securities not specifically addressed by the statutory text, we have the benefit of regulatory guidance from the SEC, the agency entrusted by Congress with the implementation of the securities laws."); *Morales* v. *Gould Invrs. Tr.*, 445 F. Supp. 1144, 1149 (S.D.N.Y. 1977) (discussing breadth of coverage of Section 16(b)), *aff'd sub nom. Morales* v. *Gould*, 578 F.2d 1369 (2d Cir. 1978).  That said, courts have cautioned that "[f]inancial instruments that do not fall squarely into [the Section 16(b)] framework are to be construed narrowly to favor the insider because of the strict-liability nature of Section 16(b)."  *Donoghue* v. *Patterson Companies, Inc.*, 990 F. Supp. 2d 421, 424 (S.D.N.Y. 2013) (citing *Levy* v. *Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 16 (2d Cir. 2001)); *accord Foremost-McKesson, Inc.* v. *Provident Secs. Co.*, 423 U.S. 232, 251 (1976).

### 3. Section 16(b) and Derivative Securities

In 1991, the Securities and Exchange Commission (the "SEC") amended its rules relating to Section 16(b) to clarify application of the section to "derivative securities" — securities "that relate to, or derive their value from, an equity security of the issuer, whether or not they represent a right to acquire an equity security of the issuer and regardless of by whom issued."  Peter J.

Romeo & Alan L. Dye, SECTION 16 TREATISE AND REPORTING GUIDE § 3.03 at 263 (4th ed. 2012) (hereinafter, "Romeo & Dye"); *see also Magma Power Co.* v. *Dow Chem. Co.*, 136 F.3d 316, 321 (2d Cir. 1998) (explaining that amendments were enacted "in order to clear up uncertainties as to how that section applies to derivative securities").  "The result of these amendments is to make 'holding derivative securities ... functionally equivalent to holding the underlying equity securities.'" *Gwozdzinsky*, 156 F.3d at 308 (quoting Ownership Reports and Trading by Officers, Directors, and Principal Security Holders, Exchange Act Release No. 28,869 [1990-1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 84,709, at 81,258 (Feb. 8, 1991) (hereinafter, "*Ownership Reports and Trading by Officers*")).

The SEC revised Rule 16a-1(c) to include within the definition of "derivative securities" "any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security, or similar securities with a value derived from the value of an equity security."  17 C.F.R. § 240.16a-1(c).  Of perhaps greater significance to the instant motion, the SEC addressed in Rule 16b-6 qualifying purchases and sales in the context of derivative securities:

> (a)  The establishment of or increase in a call equivalent position or liquidation of or decrease in a put equivalent position shall be deemed a purchase of the underlying security for purposes of section 16(b) of the Act, and the establishment of or increase in a put equivalent position or liquidation of or decrease in a call equivalent position shall be deemed a sale of the underlying securities for purposes of section 16(b) of the Act:  *Provided, however*, That if the increase or decrease occurs as a result of the

16

fixing of the exercise price of a right initially issued without a fixed price, where the date the price is fixed is not known in advance and is outside the control of the recipient, the increase or decrease shall be exempt from section 16(b) of the Act with respect to any offsetting transaction within the six months prior to the date the price is fixed.

(b)     The closing of a derivative security position as a result of its exercise or conversion shall be exempt from the operation of section 16(b) of the Act, and the acquisition of underlying securities at a fixed exercise price due to the exercise or conversion of a call equivalent position or the disposition of underlying securities at a fixed exercise price due to the exercise of a put equivalent position shall be exempt from the operation of section 16(b) of the Act: *Provided, however*, That the acquisition of underlying securities from the exercise of an out-of-the-money option, warrant, or right shall not be exempt unless the exercise is necessary to comport with the sequential exercise provisions of the Internal Revenue Code (26 U.S.C. 422A).

17 C.F.R. § 240.16b-6 (emphases in original).[5]

## B.     Analysis

### 1.     Plaintiff Has Failed to State a Claim with Respect to the December 2018 to February 2019 Transactions (Claim I)

Beginning with the first of Plaintiff's claims, the Moyes Defendants concede that the December 2018 open market sale of 1,173,680 shares of Knight-Swift stock to Knight-Swift and the February 2019 VPF transaction constituted "sale" transactions for purposes of Section 16(b). They contend,

---

[5]     *See* 17 C.F.R. § 240.16a-1(b) ("The term call equivalent position shall mean a derivative security position *that increases in value as the value of the underlying equity increases*, including, but not limited to, a long convertible security, a long call option, and a short put option position." (emphasis added)); *id.* § 240.16a-1(h) ("The term put equivalent position shall mean a derivative security position *that increases in value as the value of the underlying equity decreases*, including, but not limited to, a long put option and a short call option position." (emphasis added)).

17

however, that the partial termination of what Plaintiff has called the "Early Repo" in December 2018 did *not* constitute a purchase transaction, but rather was another "sale" transaction; the Moyes Defendants contend further that since they did not otherwise engage in a qualifying purchase transaction during the six months surrounding each of the December 2018 and February 2019 sales, Claim I must be dismissed. (*See* Def. Br. 9-14). Thus, the precise question before the Court is whether, as Plaintiff claims, the partial termination of the Early Repo in December 2018 and the attendant amendment to the repo agreement resulted in a qualifying purchase transaction for Cactus II that could be matched with any of the sale transactions acknowledged by the Moyes Defendants. Ultimately, the Court finds that Plaintiff has not pleaded a purchase transaction.

### a.   Plaintiff Has Adequately Alleged a Derivative Transaction

As a preliminary matter, the Court acknowledges the paucity of case law as to whether a repurchase transaction can constitute a derivative security for purposes of Rule 16a-1(c). Perhaps for that reason, the Moyes Defendants grapple in their briefing with the characterization of their repo transactions. The Moyes Defendants argue that through the Early Repo, they merely pledged some of the Knight-Swift shares as collateral for a loan from CGMI. (*See* Def. Br. 10; *see also id.* at 3 ("The Repurchase Agreement was, in effect, a secured loan, pursuant to which the Moyes Defendants pledged to CGMI 4,868,208 shares of Knight-Swift that they already owned as collateral in exchange for a cash advance and payment of interest.")). The partial termination of the Early

Repo in December 2018 did not constitute a new purchase of Knight-Swift shares, the Moyes Defendants reason; rather, through the partial termination, the Moyes Defendants simply permitted CGMI to sell some of their shares to reduce their indebtedness to CGMI.  (*Id.* at 10).

But, as Plaintiff explains, repo transactions differ from collateralized loans in relevant ways.  (*See* Pl. Opp. 12-13).  In a collateralized loan: (i) property is pledged by the borrower as security against a debt, not sold to the lender; (ii) the borrower receives funds for temporary use, not as payment for the collateral; and (iii) the borrower retains title and full ownership over the collateral of the property, with a security interest created in favor of the lender. Further, in a collateralized loan transaction, the borrower does not commit to a future sale (or "repurchase") of the securities transferred as collateral but rather commits to repaying the loan, and looks forward to retrieving securities that remained the borrower's property and cannot be sold by the lender absent the borrower's default.  (*Id.*).[6]

As it happens, the parties' efforts to compare and contrast collateralized loan transactions are largely beside the point, because "[f]or purposes of this motion, the Moyes Defendants do not dispute that the Repurchase Agreement

---

[6]     The Moyes Defendants recognize as much in their reply:

> The Moyes Defendants did not contend for purposes of this motion that the May 2014 Repurchase Agreement was a collateralized loan.  Rather, they analogized the transaction to a "secured loan" or a "revolving loan" because, in effect, the Repurchase Agreement operated as such.

(Def. Reply 3 n.2).

was a 'derivative security' under Section 16(b)." (Def. Br. 11 n.4). A repo transaction can qualify as a derivative security under Rule 16a-1(c) because the value of the contractual right to buy (or obligation to sell) securities in the future "repurchase" transaction can be derived from the underlying shares prior to settlement, and/or the associated predicated value of the shares at settlement. *See* 17 C.F.R. § 240.16a-1; *Analytical Surveys, Inc.* v. *Tonga Partners LLP*, 684 F.3d 36, 49-50 (2d Cir. 2012). In this case, the Early Repo effectively put the Moyes Defendants in a "call equivalent" position, in that they would benefit from any increase in value of the underlying equity over the course of the agreement's life, and put CGMI in a "put equivalent" position, in that it would benefit from any decrease in value of the underlying equity over the course of the agreement's life.

### b. Plaintiff Has Not Adequately Alleged a Qualifying Purchase and Sale

Resolution of this motion thus reduces to whether Plaintiff has adequately pleaded that the partial termination of the Early Repo in December 2018 comprised, in whole or in part, a purchase transaction for Section 16(b) purposes. To review, under the Early Repo, the Moyes Defendants were obligated to repurchase a total of 4,868,208 shares of Knight-Swift stock previously sold to CGMI, for a minimum total repurchase price of $125 million (equivalent to $25.68 per share). On December 21, 2018, the Moyes Defendants terminated the Early Repo with respect to a total of 1,537,205 shares, which shares were then trading at a price of $23.98 per share. To partially terminate the Early Repo, the Moyes Defendants made a cash

payment to CGMI equal to the difference between the repurchase price and the current market price of the underlying stock, without requiring the physical return of the proportional shares subject to early termination.

Plaintiff contends that the termination of the Early Repo materially changed the Moyes Defendants' call equivalent position with respect to the outstanding 3,331,003 shares by increasing the effective per-share repurchase price.  (*See* Pl. Opp. 16).  Plaintiff further alleges that the Moyes Defendants' re-establishment of the settlement price associated with their call equivalent position with respect to the outstanding 3,331,003 shares subject to the Early Repo constitutes the acquisition by the Moyes Defendants of a new call equivalent position, which he terms the "New Repo," and which he claims is treated as a Section 16(b) purchase by the Moyes Defendants of the underlying securities on the date of the partial termination.  (*Id.*).  In opposition, the Moyes Defendants contend that because the partial termination of the Early Repo constituted a sale of 1,537,205 shares, and not a new purchase of 3,331,03 shares, the partial termination constituted a liquidation or decrease in a call equivalent position already in existence, and thus a sale of the underlying securities under Rule 16b-6(a).  (*See* Def. Br. 4, 10; Def. Reply 6-8).

In general, SEC regulations treat the date of initial acquisition of a fixed-price derivative option, rather than the date of its exercise, as the "purchase" or "sale" date for purposes of Section 16(b).  *See Analytical Surveys*, 684 F.3d at 48-49; *see also Morrison* v. *Madison Dearborn Capital Partners III, L.P.*, 389 F. Supp. 2d 596, 600 (D. Del. 2005), *aff'd*, 463 F.3d 312 (3d Cir. 2006) ("The

purchase of derivative securities is the relevant event under Rule 16b-6 because, at that point, the buyer is able, for the last time, to negotiate the price at which the underlying stock will be obtained.  Thus, that is the last time that inside information can be exploited when setting the purchase price.").

However, amendments to an existing derivative security, if sufficiently material, may be considered simultaneous purchases and sales for purposes of Section 16(b).  As the leading treatise on Section 16 observes,

> Changing the terms of an outstanding … derivative security requires advance analysis and planning, because the change may be deemed so significant that it effectively results in the grant of a new security and the cancellation of the old security for purposes of Section 16.  A deemed cancellation and re-grant not only must be reported under Section 16(a), but also may constitute a sale, a purchase, or both for purposes of Section 16(b).

Romeo & Dye, *supra*, § 3.03[6] at 315.  Courts have similarly adopted the SEC's position that "a material amendment to a derivative security is deemed to be a redemption of [the] old security and grant of a new security for purposes of Section 16."  *Sun River Energy, Inc.* v. *McMillan*, No. 3:13 Civ. 2456 (SAF), 2014 WL 4771852, at *12 (N.D. Tex. Sept. 25, 2014).

In *Analytical Surveys*, the Second Circuit determined that amendments to a note that (i) extended its maturity date and (ii) eliminated the requirement that the principal be converted into shares at maturity resulted, for Section 16(b) purposes, in a new note.  684 F.3d at 47.  The Court identified the relevant question as "whether the changed terms in the 2004 Note gave Tonga a greater opportunity to abuse inside information in short-swing trading at *any*

time from acquisition in June 2004 to maturity in January 2006." *Id.* In concluding in the affirmative, the Court reasoned:

> [T]he changes made from the 2003 Note to the 2004 Note were material. The changes allowed Tonga more time — from April 2, 2005, when the 2003 Note was to mature, until January 2006 — within which to use inside information in determining whether (and when) to convert the Note into shares; Tonga could, in fact, choose to wait until the maturity date itself to make that call, if need be, because the 2004 Note lacked the mandatory conversion element of the previous Note. Moreover, at maturity, the elimination of that mandatory conversion provision gave Tonga latitude to use inside information to determine whether it could realize a greater return from taking the principal balance in cash or from converting the principal into shares for later sale.

*Id.* at 47-48; *see also Greenberg* v. *Hudson Bay Master Fund*, No. 14 Civ. 5226 (DLC), 2015 WL 2212215, at *9 (S.D.N.Y. May 12, 2015) (concluding that amendment of convertible notes to eliminate redemption rights, re-set interest rate, and change maturity date was material).

Both courts and commentators have recognized that the exercise price of a derivative security "is among the most material of its terms." *Romeo & Dye*, *supra*, at 317; *see also Sun River Energy, Inc.*, 2014 WL 4771852, at *12 (citing *Analytical Surveys*, 684 F.3d at 47 n.17, which in turn cited *Ownership Reports and Trading by Officers*) (concluding that amendment to option that changed the purchase price and extended the exercise deadline was material). That said, courts and the SEC have found amendments to be deemed cancellations and regrants (*i.e.*, simultaneous purchases and sales) where they resulted in a *decrease* of the exercise price — and not, as here, in an increase. *See* Romeo &

Dye, *supra*, at n.312 (discussing SEC No-Action Letters); *see also Chechele* v. *Ward*, No. 10 Civ. 1286 (VML), 2011 WL 1405244, at *5 (W.D. Okla. Apr. 13, 2011) ("Because the December Amendment reduced the exercise price of the October Warrant, the Court finds that the amendment was material and, thus, resulted in a deemed cancellation of the October Warrant and a regrant of a new warrant.  Further, the Court finds that said deemed cancellation of the October Warrant, which was a derivative security, by the December Amendment should be deemed a purchase of a derivative security under Section 16(b).").  Plaintiff has not cited, and the Court has not found in the case law or relevant secondary sources, any case in which an increase in the exercise price, and correspondingly a decrease in the call equivalent position, has been deemed a purchase.  Indeed, Rule 16b-6(a) is explicit that a decrease in a call equivalent position is a deemed sale.  *See* 17 C.F.R. § 240.16b-6(a).

Accordingly, the Court concludes, on the materials that it may properly consider at this stage of the litigation, that Plaintiff has not adequately alleged that the December 2018 amendment increased the Moyes Defendants' call equivalent position or accomplished any other material change such that it constituted a purchase, or a simultaneous purchase and sale, under Section 16(b).  Significantly, the other terms of the Early Repo, including in particular its expiration date, remained the same;[7] *increasing* the per-share exercise price could not be said to have afforded the Moyes Defendants "a greater opportunity

---

[7]     Indeed, as the Complaint concedes, the "3,331,003 shares continued to be bound by the terms of the Early Repos."  (Compl. ¶ 13).

to abuse inside information in short-swing trading at any time from acquisition … to maturity," as required under *Analytical Surveys*.  Because the Complaint pleads only sales, with no matching purchases during the six-month periods surrounding each sale, Plaintiff has failed to allege a Section 16(b) violation in his Claim I.

## 2. Plaintiff Has Stated a Claim with Respect to the August to September 2019 Transactions (Claim II)

In Claim II, Plaintiff alleges that (i) each of the amended VPF transactions entered into on August 23, 2019, and September 10, 2019, constituted a "material amendment" to VPF contracts previously entered into by the Moyes Defendants, and (ii) each material amendment is treated as the disposition of the pre-existing VPF contract and the simultaneous establishment of a new VPF contract, for purposes of Section 16(b).  (*See* Compl. ¶¶ 27, 39).  More specifically, Plaintiff claims that the disposition of each outstanding VPF contract is deemed equivalent to the Moyes Defendants' purchase (or re-purchase) of the shares covered by (and previously "sold" under) the outstanding VPF contract; and their establishment of each new VPF contract is deemed equivalent to the sale (or re-sale) by the Moyes Defendants of the same number of shares pursuant to their new VPF positions.  (*Id.* at ¶¶ 28, 40).

In this regard, the Moyes Defendants do not contest that these amendments were sufficiently material to amount to deemed sales and repurchases.  Instead, the Moyes Defendants argue that Claim II should be dismissed because Plaintiff has failed to allege that the Moyes Defendants "realized" any "profit" from their short swing transactions.  (Def. Br. 14).  The

Complaint, however, explicitly claims profits from the subject transactions in an amount unknown to Plaintiff (*see* Compl. ¶ 43), and seeks an accounting of the Moyes Defendants' profit (*see id.* at ¶ 46(a)).[8]  The Moyes Defendants cite no law indicating that Plaintiff, at this stage, must provide them with an accounting of their profits or that his Section 16(b) claim is subject to any heightened pleading requirements.  Accordingly, the Moyes Defendants' motion is denied with respect to Claim II.

## CONCLUSION

For the reasons explained above, the Moyes Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.  The Court grants the motion with respect to Claim I, and denies the motion with respect to Claim II. The Clerk of Court is directed to terminate the motion at docket entry 27.

The Moyes Defendants' are hereby ORDERED to submit an answer to the claim remaining in Plaintiff's Complaint on or before **October 23, 2020**.

---

[8]    Indeed, Plaintiff's opposition brief performs the calculations to determine the Moyes Defendants' short swing profits.  (*See* Pl. Opp. 21-23).  Plaintiff calculates that with respect to Claim II, the Moyes Defendants made $153,819,165 in short swing profits when matching the Moyes Defendant's August 23, 2019 VPF amendment constituting a purchase of shares with their September 10, 2019 VPF amendment constituting a sale of shares.  (*Id.* at 22-23).  But, as noted in the text, Plaintiff is not required to specify the precise amount of profits to plead a Section 16(b) claim adequately.  *See Chechele* v. *Sperling*, 758 F.3d 463, 467 (2d Cir. 2014) (holding that for liability to attach under Section 16(b) the plaintiff must prove: "that there was [i] a purchase and [ii] a sale of securities [iii] by an [insider] [iv] within a six-month period." (quoting *Gwozdzinsky* v. *Zell/Chilmark Fund, L.P.*, 156 F. 3d 305, 308 (2d Cir. 1998)); *see also Roth* v. *Goldman* Sachs Grp., Inc., 740 F.3d 865, 869 (2d Cir. 2014) (same).  These are the very cases cited by the Moyes Defendants.  (*See* Def. Br. 9, 14).

The parties are hereby ORDERED to confer and submit a proposed case management plan on or before **October 30, 2020**.

SO ORDERED.

Dated:       September 30, 2020
            New York, New York

_____
                KATHERINE POLK FAILLA
                United States District Judge