UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

MARK RUBENSTEIN,

                          Plaintiff,

                -v.-

KNIGHT-SWIFT TRANSPORTATION HOLDINGS
INC.,

                          Nominal Defendant,

JERRY C. MOYES and VICKIE MOYES,

                          Defendants.

------------------------------------------------------------

19 Civ. 7802 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

For the second time in this litigation, the Court must decide whether certain transactions involving complex derivative securities implicate the proscriptions of Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78p(b). Plaintiff Mark Rubenstein ("Rubenstein" or "Plaintiff") initially brought this shareholder suit on behalf of nominal defendant Knight-Swift Transportation Holdings Inc. ("Knight-Swift" or the "Company"), against Defendants Jeffrey C. Moyes and Vickie Moyes (together, the "Moyes Defendants"), beneficial owners of more than ten percent of Knight-Swift stock. Plaintiff sought disgorgement of alleged short-swing profits he claims the Moyes Defendants realized in connection with certain derivatives transactions they entered into with various Citibank entities involving Knight-Swift stock.

By Opinion and Order dated September 30, 2020, the Court granted in part and denied in part the Moyes Defendants' motion to dismiss, finding in relevant part that the partial termination of a bespoke repurchase agreement in December 2018 did not implicate Section 16(b).  *See Rubenstein* v. *Knight-Swift Transp. Holdings Inc.*, 492 F. Supp. 3d 206 (S.D.N.Y. 2020) ("*Knight-Swift I*"), *reconsideration denied*, No. 19 Civ. 7802 (KPF), 2021 WL 3855863 (S.D.N.Y. Aug. 27, 2021) ("*Knight-Swift II*").  Now before the Court are the Moyes Defendants' motion for summary judgment as to the remaining Section 16(b) claim and Plaintiff's cross-motion to exclude the Moyes Defendants' expert testimony pursuant to *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  For the reasons that follow, the Court grants the Moyes Defendants' motion for summary judgment and denies Plaintiff's cross-motion to exclude.

**BACKGROUND**[1]

**A.    Factual Background**

**1.    The Parties**

Knight-Swift is a publicly traded company whose shares are listed on the New York Stock Exchange, and the Moyes Defendants are among its founders.

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with the Moyes Defendants' motion for summary judgment.  The Court primarily sources facts from the Moyes Defendants' Local Civil Rule 56.1 Statement of Material Undisputed Facts (Dkt. #101 ("Def. 56.1")) and Plaintiff's Response to the Moyes Defendants' Local Civil Rule 56.1 Statement (Dkt. #107 ("Pl. 56.1" or "Plaintiff's Local Rule 56.1 Counterstatement")).  Additionally, the Court sources certain facts from Plaintiff's First Amended Complaint (Dkt. #25 ("FAC")), and from the parties' joint Stipulation as to Certain Facts for Purposes of Summary Judgment, and the exhibits attached thereto (Dkt. #69 ("Joint Stipulation")).

2

(Kortum Decl. ¶¶ 2-3).[2]  At all relevant times, the Moyes Defendants, through

various holding companies, beneficially owned approximately 40.9 million

shares of common stock of Knight-Swift, which shares represented

approximately twenty-four percent of Knight-Swift's outstanding shares as of

August 23, 2019, and September 10, 2019, the relevant dates for purposes of

Plaintiff's Section 16(b) claim.  (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1).  For purposes of

---

The Court draws additional facts from the declarations submitted by the parties and the exhibits attached thereto, including: the Declaration of Christopher R. Kortum (Dkt. #102, 105 (the "Kortum Declaration" or "Kortum Decl.")); the Declaration of John D. Pernick (Dkt. #103, 104 (the "Pernick Declaration" or "Pernick Decl.")); the Declaration of James A. Hunter (Dkt. #108 ("Hunter Decl.")); the Release and Termination Agreement, included as Exhibit K to the Kortum Declaration (Dkt. #106-7 ("Citi Release and Termination Agreement")); the Trigger Price Agreement, included as Exhibit N to the Kortum Declaration (Dkt. #106-10 ("TPA")); the Expert Report of David Marcus, Ph.D., included as Exhibit 17 to the Pernick Declaration (Dkt. #103-7 ("Marcus Report")); the deposition transcript of Dr. Marcus, included as Exhibit AA to the Pernick Declaration (Dkt. #104-4 ("Marcus Dep.")); and the deposition transcript of James Heathcote, included as Exhibit Z to the Pernick Declaration (Dkt. #104-3 ("Heathcote Dep.")).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where a fact stated in a movant's Rule 56.1 Statement is supported by evidence and controverted only by a conclusory statement by the opposing party, the Court finds that fact to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Where Plaintiff agrees to a fact set forth in the Moyes Defendants' Rule 56.1 Statement in its entirety, the Court cites only to the Moyes Defendants' Rule 56.1 Statement.

For ease of reference, the Court refers to the Moyes Defendants' memorandum of law in support of their motion for summary judgment as "Def. Br." (Dkt. #100); to Plaintiff's memorandum of law in opposition to the Moyes Defendants' motion for summary judgment and in support of his *Daubert* Motion as "Pl. Opp." (Dkt. #109); to the Moyes Defendants' reply memorandum of law in further support of their motion for summary judgment and in opposition to Plaintiff's *Daubert* motion as "Def. Reply" (Dkt. #114); and to Plaintiff's reply memorandum of law in further support of his *Daubert* motion as "Pl. Reply" (Dkt. #115).

[2]     Swift Transportation Company ("Swift") merged with Knight Transportation, Inc. to create Knight-Swift in 2017.  (Def. Br. 2; Kortum Decl. ¶ 2).  The Moyes Defendants' agreements prior to 2017 concern shares of Swift, and not Knight-Swift.

this motion, there is no dispute that at all relevant times, the Moyes Defendants beneficially owned more than ten percent of Knight-Swift's shares. Plaintiff also owns shares in Knight-Swift, and brings this action in that capacity.  (FAC ¶ 2).

### 2. Variable Pre-Paid Forward Contracts Generally

The securities at issue in this motion are variable pre-paid forward contracts ("VPFCs"), an esoteric derivative rarely analyzed by courts.  The leading treatise on Section 16 explains that a typical VPFC

> obligates the seller to sell, and the counterparty (usually a broker-dealer) to purchase, shares of issuer stock on a specified date in the future, usually two to five years after the date of execution of the contract.  At the time of execution of the contract neither the number of shares that will be deliverable upon settlement nor the price per share of the securities to be delivered is known.  Instead, the contract specifies (i) a maximum number of shares that may become deliverable under the contract (the "covered shares") and (ii) a fixed aggregate price payable for the shares ultimately delivered at settlement.
>
> The actual number of shares deliverable upon settlement depends upon the market price of the issuer's stock at the time of settlement.  The contract typically provides that (i) all of the covered shares will be delivered if the market price at the time of settlement is at or below a minimum price per share (the "floor price"), and (ii) a specified minimum number of shares will be delivered if the market price equals or exceeds a maximum price per share (the "ceiling price" [or "cap price"]).
>
> The counterparty pays the aggregate price of the shares at the time of execution of the contract.  T[his price] is determined primarily by multiplying the number of covered shares by the floor price, and then discounting that amount to reflect, among other things, that the

> seller is receiving a payment several years in advance of
> the delivery of shares on the settlement date.

PETER J. ROMEO & ALAN L. DYE, SECTION 16 TREATISE AND REPORTING GUIDE § 3.03

at 271 (5th ed. 2019) (hereinafter, "Romeo & Dye").  A VPFC therefore

implicates at least three different rights or obligations:

> ([i]) the insider's right to "put" the maximum number of
> shares to the counterparty at the floor price if the
> market price at settlement is at or below the floor price,
> (ii) the counterparty's right to acquire a fixed number of
> shares at the ceiling price (or an indeterminate number
> of shares at an indeterminate price per share) if the
> market price at settlement is at or above the ceiling
> price, and (iii) the insider's obligation to deliver, and the
> counterparty's obligation to accept, an indeterminate
> number of shares at a "floating" price if the market at
> settlement is between the floor price and the ceiling
> price.

*Id.* § 3.03 at 273-74.

As relevant here, the Moyes Defendants, through their holding

companies Cactus Holdings Company LLC ("Cactus Holdings") and M Capital

Group Investors II, LLC ("M Capital II"), entered into several VPFCs with

different Citibank entities beginning in 2013.  (Def. 56.1 ¶¶ 4, 10).  In the

subsections that follow, the Court outlines (i) the terms of the existing VPFCs

prior to the August 2019 termination at issue; (ii) the termination of the VPFC

between the Moyes Defendants and Citibank, N.A. ("Citibank") and entrance

into a new VPFC between the Moyes Defendants and Citigroup Global Markets

Inc. ("CGMI") in August 2019; and (iii) the VPFC amendments in September

2019.

### 3.     The Moyes Defendants' VPFCs Prior to August 2019

The Moyes Defendants entered into the first of multiple VPFCs with Citibank on October 29, 2013, the terms of which were governed by a master agreement between Citibank and M Capital II (the "October 2013 Master Agreement"), and two subsequent supplemental confirmations (the "Transaction 1 Supplemental Confirmation" and "Transaction 2 Supplemental Confirmation," and together with the October 2013 Master Agreement, the "October 2013 VPFCs").  (Def. 56.1 ¶¶ 2-4).  Pursuant to those agreements, Citibank delivered to the Moyes Defendants approximately $438 million in exchange for the Moyes Defendants' pledge to deliver a maximum of just under 26 million shares of Swift stock at a specified later date.  (*Id.* ¶ 3; Pl. 56.1 ¶ 3).[3] The settlement terms of the Transaction 1 Supplemental Confirmation set forth a forward floor price of $22.54 and a forward cap price of $28.175, with settlement dates between January 4, 2016, and February 1, 2016.  (Def. 56.1 ¶ 6).  The settlement terms of the Transaction 2 Supplemental Confirmation set forth a forward floor price of $20.286 and a forward cap price of $36.064, with settlement dates between July 5, 2016, and August 1, 2016.  (*Id.*).  On October 29, 2013, Swift's stock price closed at $17.31, below the Forward Floor

---

[3]     The Moyes Defendants assert that they merely "borrowed" the approximately $438 million from Citibank, while Plaintiff contends that such funds were paid as part of Citibank's obligations under the VPFCs.  (*Compare* Def. 56.1 ¶ 3, *with* Pl. 56.1 ¶ 3).  Given the structure of VPFCs generally, and the specific terms of the agreements underlying the October 2013 VPFCs here, the Court concludes that the funds reflected Citibank's upfront payment obligation under the contracts (effectively its purchase of a call option), and were not a loan.  (*See* Kortum Decl., Ex. A, B, C).  *See also Chechele* v. *Sperling*, 758 F.3d 463, 468 (2d Cir. 2014) ("the view that [VPFC]s are derivatives — not loans — is consistent with every authority revealed by research")).

Price of both the Transaction 1 and Transaction 2 Supplemental Confirmations.  (*Id.* ¶ 7).

Between December 2013 and August 2019, the Moyes Defendants entered into additional transactions with Citibank pursuant to which the October 2013 VPFCs were amended to extend the settlement dates in the Transaction 1 and Transaction 2 Supplemental Confirmations and, in most cases, to change the floor and cap prices.  (Def. 56.1 ¶ 8; *see also* Joint Stipulation, Ex. A (outlining various amendments to the VPFCs from 2013 to 2019)).  During this time, the Moyes Defendants also entered into additional VPFCs with Citibank and its affiliate CGMI.  (Def. 56.1 ¶ 9).  These additional VPFCs were split amongst the Moyes Defendants' various holding companies. (*Id.* ¶ 10).

By February 2019, the Moyes Defendants were parties to a total of four VPFCs with Citibank and CGMI, with settlement dates ranging between February 15 and February 19, 2019.  (Def. 56.1 ¶¶ 11-12).  On February 13, 2019, the Moyes Defendants sought to extend the settlement dates and to raise the floor and cap prices of each existing VPFC, and also to terminate a separate repurchase agreement with Citigroup Global Markets Limited ("CGML").  (*Id.* ¶¶ 13-14).  *See also Rubenstein I*, 492 F. Supp. 3d at 217-21 (discussing termination of repurchase agreement).  To do so, the Moyes Defendants entered into a new VPFC (the "February 2019 Supplemental Confirmation") with CGMI, pursuant to which they pledged 3,331,003 Knight-Swift shares.  (*Id.* ¶ 15). Thereafter, the Moyes Defendants were participants in five VPFCs with

7

Citibank and CGMI, under which they had pledged a total of 29,467,003

Knight-Swift shares.  (*Id.* ¶ 17).  The settlement terms and names of each VPFC

at that time were as follows:

### February 2019 Supplemental Confirmation (Cactus Holdings)

| | |
|---|---|
| Pledged Shares: | 3,331,003 |
| Forward Floor Price: | $35.9841 |
| Forward Cap Price: | $42.9762 |
| Settlement Dates: | August 30, September 3, 4, 2019 |

### Fourth Amended and Restated May 2016 Transaction 1 Supplemental Confirmation (M Capital II)

| | |
|---|---|
| Pledged Shares: | 8,851,692 |
| Forward Floor Price: | $40.9682 |
| Forward Cap Price: | $49.1983 |
| Settlement Dates: | August 30, September 3, 4, 2019 |

### Fourth Amended and Restated May 2016 Supplemental Confirmation of February 2019 (Cactus Holdings)

| | |
|---|---|
| Pledged Shares: | 5,044,308 |
| Forward Floor Price: | $40.9682 |
| Forward Cap Price: | $49.1983 |
| Settlement Dates: | August 30, September 3, 4, 2019 |

### Fifth Amended and Restated Supplemental Confirmation of February 2019 (Cactus Holdings)

| | |
|---|---|
| Pledged Shares: | 2,376,000 |
| Forward Floor Price: | $39.9687 |
| Forward Cap Price: | $47.9451 |
| Settlement Dates: | August 30, September 3, 4, 2019 |

### Seventh Amended and Restated Transaction 1 Supplemental Confirmation (M Capital II)

| | |
|---|---|
| Pledged Shares: | 9,864,000 |
| Forward Floor Price: | $39.9687 |
| Forward Cap Price: | $47.9451 |
| Settlement Dates: | August 30-September 27, 2019 |

(*Id.* ¶ 18; Pl. 56.1 ¶ 18).

### 4.       The August 2019 VPFC Transactions

In July 2019, the Moyes Defendants asked CGMI to propose a structure
to extend the settlement dates and increase the forward floor and cap prices of
the VPFCs *without* requiring a cash payment or transfer of additional shares to
CGMI.  (Def. 56.1 ¶¶ 19-20; Pl. 56.1 ¶¶ 19-20).  CGMI agreed to do so on the
condition that the Moyes Defendants terminate one of their existing VPFCs
with Citibank (the Seventh Amended and Restated Transaction 1 Supplemental
Confirmation (the "Seventh Amended VPFC")) and enter into a new VPFC with
CGMI that would cover the same 9,864,000 Knight-Swift shares pledged under
the prior agreement (the Transaction 2 Supplemental Confirmation ("the
"August 2019 CGMI VPFC")).  (Def. 56.1 ¶¶ 20-22, 24; Joint Stipulation, Ex. A
at 5).  Pursuant to the Citi Release and Termination Agreement, the funds owed
by the Moyes Defendants to Citibank for terminating the Seventh Amended
VPFC amounted to $332,568,000, which cost was only partially satisfied by the
$313,966,000 that CGMI would transfer to the Moyes Defendants under the
terms of the August 2019 CGMI VPFC.  (*Id.* ¶¶ 23-24).  In an effort to satisfy
the remaining $18,602,000 without requiring the Moyes Defendants to pay
additional cash, CGMI proposed that the Moyes Defendants enter into a Trigger
Price Agreement (or "TPA") with CGMI.  (*Id.* ¶¶ 24-25; Pl. 56.1 ¶ 25).[4]  The

---

[4]       The parties dispute the particular VPFCs covered by the TPA.  (*Compare* Def. 56.1 ¶ 26
(stating that the TPA covered two VPFCs: the VPFC between M Capital II and CGMI in
which 8,851,692 shares were pledged and the VPFC between Cactus Holding and CGMI
in which 5,044,308 shares were pledged), *with* Pl. 56.1 ¶ 26 (quoting TPA § 2(a),
Recitals)  (noting that because the TPA "extended the scope of any 'Event of Default'
(and CGMI's resulting remedies) to 'each of the M Capital II Confirmation and Cactus I
Confirmation[,]'" and defined such terms to include all five tranches of the VPFCs, the

Moyes Defendants and CGMI entered into the TPA on August 23, 2019
(together with the termination of the Seventh Amended VPFC and entrance into
the August 2019 CGMI VPFC, the "August 2019 VPFC Transactions").  (TPA
§ 1).[5]

The TPA set forth two trigger prices: a Reset Trigger Price of $36.75 and
an Early Termination Trigger Price of $39.70.  (TPA § 1(a)).  Under the TPA, if
the Knight-Swift market price hit or exceeded the Reset Trigger Price, but
remained below the then-current Early Termination Trigger Price (the "Reset
Trigger Price Event"), CGMI was "entitled to require [the Moyes Defendants] to
pay ... the cost to increase the then-current Early Termination Trigger Price" by
$1 (the "Trigger Price Reset Amount") on any day on or after the Reset Trigger
Price Event occurred.  (*Id.* § 1(b)).  The Moyes Defendants then had a set period
of time to confirm that they had the ability to pay — and in fact would meet
their obligation to pay — the Trigger Price Reset Amount to CGMI.  (*Id.* § 1(c)).
Significantly, if (i) CGMI did not receive the Trigger Price Reset Amount by the
indicated deadline; (ii) CGMI did not timely receive notice from the Moyes
Defendants that they could (and would) pay the Trigger Price Reset Amount by
the indicated deadline; or (iii) on any trading day, the settlement price of the

---

TPA "extended" to all five)).  Because the TPA makes clear that all VPFCs were subject to
default under the TPA, and because the Moyes Defendants' version of
events, if true, does not change the fact that the VPFCs' floor prices were above the Reset Trigger Price
at any given time, this dispute is immaterial to the Court's conclusion, as explained
*infra.*

[5]     As evidenced by their respective Rule 56.1 statements, the parties espouse different
views of terms of the TPA.  (*See, e.g.*, Def. 56.1 ¶¶ 26-28; Pl. 56.1 ¶¶ 26-28).  For this
reason, the Court cites to the TPA itself, rather than to any party's interpretation of it.

VPFC was equal to or greater than the Early Termination Trigger Price (the "Trigger Price Termination Event"), it would constitute an immediate default, and CGMI would have the ability to seize all of the pledged shares under the five VPFCs.  (*Id.* § 2(a); Pernick Decl., Ex. 4 at 9 ("Jerry [Moyes] can fund a 6-month extension of his VPF[Cs] for *zero additional cash or share contribution* by incorporating a contractual Early Termination feature.  As the [Knight-Swift] share price approaches the Early Termination Price, Jerry will be required to contribute cash to reset the Early Termination Price higher (or Citi has the option to terminate and take the underlying shares).")).  For their part, the Moyes Defendants had the ability to "at any time request an increase in the then-current Early Termination Trigger Price by at least USD $1.00" by paying an amount determined by CGMI at a specified date and time.  (TPA § 2(a); *see also* Def. 56.1 ¶ 34 ("In communications prior to entry into the August 23, 2019 VPF[C] amendments and the Trigger Price Agreement, CGMI provided a schedule showing its estimate of the amount that would need to be paid under the Trigger Price Agreement to raise the Early Termination Trigger Price in response to increases in the Knight-Swift stock price.")).

Consequently, as of August 23, 2019, the Moyes Defendants were parties to five VPFCs with CGMI for which all of the pledged shares were at least potentially subject to the TPA default provisions, as well as the TPA itself, with the following settlement and trigger price terms:

**Amended and Restated February 2019 Supplemental Confirmation (Cactus Holdings)**

Pledged Shares:        3,331,003
Forward Floor Price:   $42.00
Forward Cap Price:     $52.25
Settlement Dates:      May 26-28, 2020

**Fifth Amended and Restated May 2016 Transaction 1 Supplemental Confirmation (M Capital II)**

Pledged Shares:        8,851,692
Forward Floor Price:   $44.50
Forward Cap Price:     $56.50
Settlement Dates:      March 13-April 9, 2020

**Fifth Amended and Restated May 2016 Supplemental Confirmation of February 2019 (Cactus Holdings)**

Pledged Shares:        5,044,308
Forward Floor Price:   $44.50
Forward Cap Price:     $56.50
Settlement Dates:      March 13, 16-17, 2020

**Sixth Amended and Restated Supplemental Confirmation of February 2019 (Cactus Holdings)**

Pledged Shares:        2,376,000
Forward Floor Price:   $42.50
Forward Cap Price:     $52.95
Settlement Dates:      May 26-28, 2020

**Transaction 2 Supplemental Confirmation (M Capital II)**
*(formerly the Seventh Amended VPFC between M Capital II and Citibank)*

Pledged Shares:        9,864,000
Forward Floor Price:   $42.50
Forward Cap Price:     $52.95
Settlement Dates:      May 26-June 22, 2020

**Trigger Price Agreement**

Reset Trigger Price:              $36.75
Early Termination Trigger Price:  $39.70

(Def. 56.1 ¶ 32).  The Knight-Swift share price closed on August 23, 2019, at $32.25.  (*Id.* ¶ 33).

### 5.    The September 2019 VPFC Amendments

On September 9, 2019, Knight-Swift's stock price closed at $37.21 — above the $36.75 Reset Trigger Price under the TPA, but below the Early Termination Trigger Price of $39.70 and below any Floor Price of the VPFCs. (Def. 56.1 ¶ 37; Joint Stipulation, Ex. B).  CGMI informed the Moyes Defendants that the price of increasing the Early Termination Trigger Price by $1 — and thereby avoiding seizure of their shares pursuant to the TPA's default provisions — would be $18 million.  (Def. 56.1 ¶ 38).  Under the terms of the TPA, that money had to be paid by September 10, 2019, to avoid CGMI's seizure of all pledged shares.  (*Id.* ¶ 39).

Similar to the events that precipitated the August 2019 VPFC Transactions, the Moyes Defendants requested that CGMI propose an alternative transaction that would raise the Early Termination Trigger Price, but not require either the full payment of $18 million or the seizure of their pledged shares.  (Def. 56.1 ¶ 40; Pl. 56.1 ¶ 40).  CGMI proposed — and the Moyes Defendants agreed — that CGMI would increase the Reset Trigger Price by $1.10 and the Early Termination Trigger Price by $1.00; in exchange, the Moyes Defendants would pay CGMI $6.5 million and agree to various changes in the terms of the VPFCs, including extensions to the settlement dates for three of the VPFCs by two weeks.  (Def. 56.1 ¶¶ 41-43; Pl. 56.1 ¶ 41).  These changes to the VPFC terms, according to CGMI, were "an alternative to put

[CGMI] in the same position as the $18 million, but rather than taking the $18 million in cash we took 6.5 million in cash and the balance of the 18 million or the 11.5 million we took through modifications to the VPF terms." (Heathcote Dep. 87:12-19; *see also id.* at 87:20-88:8 ("we increased the put strike, we added more ten[o]r to tranche 1 and tranche 3 and we increased the call strikes on all three tranches and with that we were comfortable to increase the reset trigger price and early termination price by a dollar …. That is what was needed … to be able for [CGMI] to be more comfortable to only accept 6.5 million in return for giving more price cushion on the reset price trigger and the early termination price trigger.")). Rather than entering into new supplemental confirmations, on September 10, 2019, CGMI and the Moyes Defendants set out the changes to the VPFCs (collectively, the "September 2019 VPFC Amendments") and the TPA in a single document called the "Trigger Price Agreement Notice," which set out the new terms as follows:

**Amended and Restated February 2019 Supplemental Confirmation (Cactus Holdings)**

Pledged Shares:          3,331,003
Forward Floor Price:      Increased from $42.00 to $43.20
Forward Cap Price:       Increased from $52.25 to $53.25
Settlement Dates:        May 26-28, 2020 to June 10-12, 2020

**Fifth Amended and Restated May 2016 Transaction 1 Supplemental Confirmation (M Capital II)**

Pledged Shares:          8,851,692
Forward Floor Price:      Increased from $44.50 to $45.50
Forward Cap Price:       Increased from $56.50 to $58.25
Settlement Dates:        No change (March 13-April 9, 2020)

**Fifth Amended and Restated May 2016 Supplemental Confirmation of February 2019 (Cactus Holdings)**

Pledged Shares:      5,044,308
Forward Floor Price:     Increased from $44.50 to $45.50
Forward Cap Price:      Increased from $56.50 to $58.25
Settlement Dates:      No change (March 13, 16, 17 2020)

**Sixth Amended and Restated Supplemental Confirmation of February 2019 (Cactus Holdings)**

Pledged Shares:      2,376,000
Forward Floor Price:     Increased from $42.50 to $43.70
Forward Cap Price:      Increased from $52.95 to $54.15
Settlement Dates:      May 26-28, 2020 to June 10-12, 2020

**Transaction 2 Supplemental Confirmation (M Capital II)**

Pledged Shares:      9,864,000
Forward Floor Price:     Increased from $42.50 to $43.70
Forward Cap Price:      Increased from $52.95 to $54.15
Settlement Dates:      May 26-June 22, 2020 to June 10-July 8, 2020

**Trigger Price Agreement**

Reset Trigger Price:            Increased from $36.75 to $37.85
Early Termination Trigger Price:    Increased from $39.70 to $40.70

(Def. 56.1 ¶¶ 44-45).  The Knight-Swift stock price closed on September 10, 2019, at $37.41.  (*Id.* ¶ 46).

### 6.      The Marcus Report

The Moyes Defendants retained David Marcus, Ph.D., Senior Vice President and former head of the finance practice at Cornerstone Research, as an expert witness to value the VPFC transactions in August and September 2019.  (Def. Br. 22; Marcus Report ¶ 1).  More specifically, Dr. Marcus was retained to calculate "the change in the value of the [VPFCs] between August and September, and then ... how the September [2019 VPFC Amendments] affected the maximum possible payoff, so to speak, to the Moyes [D]efendants."  (Marcus Dep. 12:2-6).  Dr. Marcus issued a report on his findings dated

April 26, 2022 (the "Marcus Report"), which report concluded — on the data provided — that the Moyes Defendants did not make a profit as a result of the August 2019 VPFC Transactions or the September 2019 VPFC Amendments. (*See* Marcus Report).  Prior to filing his *Daubert* motion, Plaintiff deposed Dr. Marcus on May 17, 2022, regarding the latter's qualifications, methodologies, and findings.  (*See generally* Marcus Dep.).

## B.  Procedural History

Plaintiff filed the original complaint in this action against the Moyes Defendants and Nominal Defendant Knight-Swift on August 20, 2019.  (Dkt. #1).  On October 21, 2019, Knight-Swift filed an answer to the original complaint and the Moyes Defendants filed a pre-motion letter seeking a conference in anticipation of filing a motion to dismiss.  (Dkt. #18, 19).  On October 24, 2019, Plaintiff responded to the Moyes Defendants' letter suggesting a schedule for the filing of an amended complaint and briefing on the Moyes Defendants' anticipated motion to dismiss.  (Dkt. #20).

Plaintiff filed the FAC on November 11, 2019.  (Dkt. #25).  Knight-Swift filed an answer to the FAC on December 13, 2019.  (Dkt. #26).  The Moyes Defendants filed their motion to dismiss and supporting declaration the same day.  (Dkt. #27-29; *see also* Dkt. #35-36, 40-41 (additional motion briefing)).  On September 30, 2020, the motion to dismiss was granted in part and denied in part, leaving only the Section 16(b) VPFC claim.  (Dkt. #42).  Plaintiff filed a motion for reconsideration of the partial denial and for leave to amend on October 22, 2020 (Dkt. #47-49; *see also* Dkt. #50-53 (additional motion

briefing)), which motion was denied by the Court on August 27, 2021 (Dkt. #54). The Moyes Defendants filed their answer to the FAC on November 4, 2021. (Dkt. #62).

Near the conclusion of discovery, Plaintiff filed a pre-motion letter regarding his anticipated motion for summary judgment as to liability only on February 14, 2022 (Dkt. #73), to which the Moyes Defendants replied on February 17, 2022 (Dkt. #74). Following a series of requests for extensions of time to complete discovery, the Court held a pre-motion conference on April 13, 2022, during which time the Court ruled that it would not bifurcate the case into liability and damages, and that it would not allow summary judgment motions prior the close of expert discovery. (*See* April 13, 2022 Minute Entry).

On May 2, 2022, Plaintiff filed another pre-motion letter regarding his intent to file a *Daubert* motion to exclude the testimony of Dr. Marcus and to request an additional extension of time to complete expert discovery (Dkt. #84), to which letter the Moyes Defendants responded on May 5, 2022 (Dkt. #88). The Court issued an endorsement denying the extension request, and allowing Plaintiff to file a *Daubert* motion in accordance with the parties' Case Management Plan. (Dkt. #89 (endorsement); Dkt. #57 (Case Management Plan)).

The Moyes Defendants filed a pre-motion letter regarding their intent to file a summary judgment motion on June 10, 2022 (Dkt. #92), to which Plaintiff responded on June 15, 2022 (Dkt. #93). The Court issued an Order setting forth a schedule for summary judgment and *Daubert* briefing, to end on

September 26, 2022.  (Dkt. #94).  Pursuant to the Court's Order, the Moyes Defendants filed their motion for summary judgment and supporting documentation on August 19, 2022.  (Dkt. #98-106).  Plaintiff filed his joint opposition brief and *Daubert* motion on September 16, 2022.  (Dkt. #107-110).  The Moyes Defendants filed their reply in further support of the motion for summary judgment and in opposition to Plaintiff's *Daubert* motion on October 21, 2022 (Dkt. #114), and Plaintiff filed his reply in further support of his *Daubert* motion on November 16, 2022 (Dkt. #115).  The Court now considers these motions.

## DISCUSSION

### A.    Motions for Summary Judgment Under Fed. R. Civ. P. 56

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Vt. Teddy Bear Co.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  "[T]he dispute about a material fact is 'genuine[ ]' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists; if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that

18

there is a genuine issue for trial," *Anderson*, 477 U.S. at 256, and to present

such evidence that would "allow a reasonable jury to find in his favor," *Graham*

v. *Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To defeat a summary

judgment motion, the nonmoving party "must do more than simply show that

there is some metaphysical doubt as to the material facts."  *Matsushita Elec.*

*Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "A party asserting

that a fact cannot be or is genuinely disputed must support the assertion by ...

citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials[.]"  Fed. R. Civ.

P. 56(c)(1)(A).  "If a party fails ... to properly address another party's assertion

of fact as required by Rule 56(c), the court may," among other things, "consider

the fact undisputed for purposes of the motion" or "grant summary judgment if

the motion and supporting materials — including the facts considered

undisputed — show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2),

(3).

Finally, in considering a summary judgment motion, a court must "view

the evidence in the light most favorable to the non-moving party and draw all

reasonable inferences in its favor, and may grant summary judgment only

when no reasonable trier of fact could find in favor of the nonmoving party."

*Wells Fargo Bank, Nat'l Ass'n as Tr. for Benefit of Holders of Comm. 2015-LC19*

*Mortg. Tr. Com. Mortg. Pass-Through Certificates* v. *5615 N. LLC,* No. 20 Civ.

2048 (VSB), 2022 WL 15523689, at *4 (S.D.N.Y. Oct. 27, 2022) (quoting *Allen*

v. *Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks and

citation omitted)); *see also Matsushita*, 475 U.S. at 587.  "[I]f there is any

evidence in the record that could reasonably support a jury's verdict for the

non-moving party," summary judgment must be denied.  *Marvel Characters,*

*Inc.* v. *Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

**B.      The Court Grants the Moyes Defendants' Motion for Summary Judgment**

    **1.      Overview**

Plaintiff alleges that the Moyes Defendants violated Section 16(b) because

(i) the termination of the Seventh Amended VPFC in August 2019 was a

qualifying "purchase"; (ii) the subsequent amendments to the outstanding

VPFCs in September 2019 were each a qualifying "sale";[6] and (iii) matching the

transactions under the methodology adopted by the Second Circuit for

Section 16(b) cases yields a disgorgement figure in excess of $150 million.  (Pl.

Opp. 11-20).  The Court begins its analysis by discussing Section 16(b),

particularly with respect to its application to transactions involving derivative

securities, and then explaining why none of the September 2019 VPFC

Amendments qualifies as a sale under Section 16(b).

Before doing so, however, the Court pauses to make the following

observations about Plaintiff's submissions.  Plaintiff elected not to retain (or, at

---

[6]      Plaintiff's memorandum in opposition (*see* Pl. Opp. 13-19), as well as his putative profit calculations (*id.* at 20-21), consider only the September 2019 VPFC Amendments as qualifying sale transactions.  The Court's analysis proceeds accordingly.

least, not to disclose the retention of) an expert witness to rebut the opinions offered by Dr. Marcus.  That was his prerogative.  However, throughout Plaintiff's Local Rule 56.1 Counterstatement, and in particular in his response to paragraph 47 of the Moyes Defendants' Local Rule 56.1 Statement, Plaintiff attempts to proffer expert opinions, or to generate triable disputes of fact regarding Dr. Marcus's opinions, in the form of factual assertions shorn of supporting evidence.  Federal Rule of Evidence 701, however, makes plain that Plaintiff cannot offer expert evidence in the guise of his own lay opinions.

"According to the Advisory Committee, what separates expert and lay testimony is that 'lay testimony results from a process of reasoning familiar in everyday life,' whereas 'expert testimony results from a process of reasoning which can be mastered only by specialists in the field.'"  *523 IP LLC* v. *CureMD.Com*, 48 F. Supp. 3d 600, 634 (S.D.N.Y. 2014) (citing Fed. R. Evid. 701 advisory committee's note) (collecting cases); *see also United States* v. *Kaplan*, 490 F.3d 110, 118 (2d Cir. 2007) (observing that Rule 701 requires firsthand knowledge to prevent the witness from "merely tell[ing] the jury what result to reach" and to ensure that a lay opinion is based on reasoning "familiar to the average person in everyday life" (internal quotation marks omitted)).  While the Second Circuit has allowed lay witnesses to perform "simple arithmetic calculations," *New York* v. *United Parcel Serv., Inc.*, 942 F.3d 554, 596 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 242 (2020), it has consistently upheld the exclusion of lay witness testimony grounded in specialized knowledge, *see, e.g.*, *DVL, Inc.* v. *Niagara Mohawk Power Corp.*, 490 F. App'x 378, 381 (2d Cir. 2012)

(summary order) (upholding exclusion of lay witness testimony that "relied on technical and scientific knowledge in making most of the observations and conclusions"); *Bank of China, New York Branch* v. *NBM LLC*, 359 F.3d 171, 182 (2d Cir. 2004) (finding error in admission of bank employee testimony pursuant to Rule 701 to the extent such testimony "reflected specialized knowledge [the employee] has because of his extensive experience in international banking"). Courts have also distinguished between testimony based on hypothetical and historical facts, and found the former to be "out of the realm of lay opinion testimony." *Irish* v. *Tropical Emerald LLC*, No. 18 Civ. 82 (PKC) (SJB), 2021 WL 1827115, at *7 (E.D.N.Y. May 6, 2021) (citing, *e.g.*, *Steves & Sons, Inc.* v. *JELD-WEN, Inc.*, No. 16 Civ. 545 (REP), 2018 WL 359479 (E.D. Va. Jan. 10, 2018)).

To the extent that Plaintiff makes assertions in his briefing or in opposition to the Moyes Defendants' Local Rule 56.1 Statement that are, at base, unattributed expert testimony, the Court disregards such assertions as violative of the Federal Rules and the Local Rules of this District. *See* Fed. R. Evid. 701-703 (discussing lay and expert testimony); Fed. R. Civ. P. 26(a)(2), 37(c)(1) (addressing expert notice and disclosure obligations); Local Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Relatedly, to the extent that Plaintiff advances arguments in his Local Rule 56.1 Counterstatement that are not also raised in his memorandum in opposition (*see, e.g.*, Pl. Opp. 22 (referencing "at

least 16 material disputes" set forth in Plaintiff's Local Rule 56.1

Counterstatement)), the Court does not consider such assertions or arguments.

*See Galli* v. *PricewaterhouseCoopers LLP Notice/Severance Pol'y as Amended &*

*Restated Effective Feb. 1, 2011*, No. 19 Civ. 7224 (LGS), 2020 WL 4605240, at

*8 n.12 (S.D.N.Y. Aug. 11, 2020) ("To the extent that Plaintiff is referring to

legal arguments made in Plaintiff's declarations or Rule 56.1 statement and

response, those documents are not appropriate vehicles for making legal

arguments, and the Court declines to consider them." (collecting cases)); *see*

*also* Local Civil Rule 7.1 (identifying content of legal memoranda and

declarations); Individual Rules of Civil Practice 5.C.iv ("Each memoranda of law

must include a statement of facts, and may not simply incorporate by reference

the entirety of a party's 56.1 Statement.").

> ## 2.   Applicable Law

> ### a.   Section 16(b) of the Exchange Act

Section 16(b) states in relevant part:

> For the purpose of preventing the unfair use of
> information which may have been obtained by [a
> corporate insider] by reason of his relationship to the
> issuer, any profit realized by [the insider] from any
> purchase and sale, or any sale and purchase, of any
> equity security of such issuer ... within any period of
> less than six months ... shall inure to and be
> recoverable by the issuer, irrespective of any intention
> on the part of [the insider].

15 U.S.C. § 78p(b).  Section 16(b), "a vital component of the Exchange Act, ...

was designed to prevent an issuer's directors, officers, and principal

stockholders from engaging in speculative transactions on the basis of

information not available to others." *Donoghue* v. *Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 173-74 (2d Cir. 2012) (internal quotation marks omitted). It was created as a "blunt instrument," *Magma Power Co.* v. *Dow Chem. Co.*, 136 F.3d 316, 321 (2d Cir. 1998), and "a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great," *Reliance Elec. Co.* v. *Emerson Elec. Co.*, 404 U.S. 418, 422 (1972); *see also Rosen ex rel. Price Commc'ns Corp.* v. *Price*, No. 95 Civ. 5089 (CSH), 1997 WL 401793, at *4 (S.D.N.Y. July 16, 1997) (noting that the statute has been described as "harsh," "crude," and "[d]raconian" (internal quotation marks and citations omitted)). Significantly, no showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement. *Magma Power Co.*, 136 F.3d at 320-21.

A claim under Section 16(b) requires a showing "that there was [i] a purchase and [ii] a sale of securities [iii] by an insider [iv] within a six-month period," *Chechele* v. *Sperling*, 758 F.3d 463, 467 (2d Cir. 2014) (quoting *Gwozdzinsky* v. *Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998) (internal quotation marks omitted and alteration adopted)), and (v) that the insider realized a profit, *Donoghue* v. *Patterson Co.*, 990 F. Supp. 2d 421, 424 (S.D.N.Y. 2013) (citing *Gwozdzinsky*, 156 F.3d at 308-09; *Donoghue* v. *Murdock*, No. 13 Civ. 1224 (PAE), 2013 WL 4007565 (S.D.N.Y. Aug. 6, 2013)). Indeed, "if there were no profits to disgorge, there would be no relief to grant under Section 16(b)." *In re Myovant Sciences Ltd. Sec. 16(b) Litig.*, 513 F. Supp.

24

3d 365, 372 (S.D.N.Y. 2021) (internal quotation marks omitted and alteration adopted).

"The statutory definitions of 'purchase' and 'sale' are broad and, at least arguably, reach many transactions not ordinarily deemed a sale or purchase." *Kern Cnty. Land Co.* v. *Occidental Petroleum Corp.*, 411 U.S. 582, 593-94 (1973).  That said, courts have cautioned that "[f]inancial instruments that do not fall squarely into [the Section 16(b)] framework are to be construed narrowly to favor the insider because of the strict-liability nature of Section 16(b)."  *Patterson Co.*, 990 F. Supp. 2d at 424 (citing *Levy* v. *Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 16 (2d Cir. 2001)); *accord Foremost-McKesson, Inc.* v. *Provident Secs. Co.*, 423 U.S. 232, 251-52 (1976) (noting that Section 16(b) should be "narrowly drawn," and that "serving the congressional purpose does not require resolving every ambiguity in favor of liability under [Section] 16(b)").

### b.    Section 16(b) and Derivative Securities

In 1991, the Securities and Exchange Commission (the "SEC") amended its rules relating to Section 16(b) to clarify application of the provision to "derivative securities" — securities "that relate to, or derive their value from, an equity security of the issuer, whether or not they represent a right to acquire an equity security of the issuer and regardless of by whom issued."  Romeo & Dye § 3.03 at 248; *see also Magma Power Co.*, 136 F.3d at 321 (explaining that amendments were enacted "in order to clear up uncertainties as to how that section applies to derivative securities").  "The result of these amendments is to make 'holding derivative securities ... functionally equivalent to holding the

underlying equity securities.'" *Gwozdzinsky*, 156 F.3d at 308 (quoting Ownership Reports and Trading by Officers, Directors, and Principal Security Holders, Exchange Act Release No. 28,869, 56 Fed. Reg. 7242, 7248 (Feb. 21, 1991)).

The SEC revised Rule 16a-1(c) to include within the definition of "derivative securities" "any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security, or similar securities with a value derived from the value of an equity security[,]" which definition can include VPFCs.  17 C.F.R. § 240.16a-1(c); *see also Sperling*, 758 F.3d at 468-70.  However, the definition of "derivative securities" explicitly excludes "[r]ights with an exercise or conversion privilege at a price that is not fixed."  17 C.F.R. § 240.16a-1(c)(6).  Such exempted securities are commonly referred to as "floating price" options.  *See Magma Power Co.*, 136 F.3d at 321.  The SEC's revised rule treats the date of acquisition of a derivative with a conversion privilege at a fixed price as the relevant date for Section 16(b) purposes; the date of settlement of such an instrument is a non-event.  *See id.* at 322; *see also* 17 C.F.R. § 240.16b-6(b) ("[T]he closing of a derivative security position as a result of its exercise or conversion shall be exempt from the operation of section 16(b) of the Act[.]").  "[W]here the security has a conversion privilege at a floating price, the date of settlement is the relevant date for § 16(b)."  *Murdock*, 2013 WL 4007565, at *5 (citations omitted).

26

The SEC also addressed, in Rule 16b-6, transactions that qualify as purchases and sales in the context of derivative securities:

(a)   The establishment of or increase in a call equivalent position or liquidation of or decrease in a put equivalent position[7] shall be deemed a purchase of the underlying security for purposes of section 16(b) of the Act, and the establishment of or increase in a put equivalent position or liquidation of or decrease in a call equivalent position shall be deemed a sale of the underlying securities for purposes of section 16(b) of the Act[;] and

(b)   The closing of a derivative security position as a result of its exercise or conversion shall be exempt from the operation of section 16(b) of the Act, and the acquisition of underlying securities at a fixed exercise price due to the exercise or conversion of a call equivalent position or the disposition of underlying securities at a fixed exercise price due to the exercise of a put equivalent position shall be exempt from the operation of section 16(b) of the Act[.]

17 C.F.R. § 240.16b-6(a)-(b).

### 3.   None of the September 2019 VPFC Amendments Constituted a "Sale" for Section 16(b) Purposes

The Court accepts, for purposes of its analysis, that the two interrelated transactions into which the Moyes Defendants entered on August 23, 2019 — namely, the Citi Release and Termination Agreement terminating the Seventh Amended VPFC and the Transaction 2 Supplemental Confirmation setting out the terms of the August 2019 CGMI VPFC — constitute a "purchase" (if not a

---

[7]   *See* 17 C.F.R. § 240.16a-1(b) ("The term call equivalent position shall mean a derivative security position that increases in value as the value of the underlying equity increases, including, but not limited to, a long convertible security, a long call option, and a short put option position."); *id.* § 240.16a-1(h) ("The term put equivalent position shall mean a derivative security position that increases in value as the value of the underlying equity decreases, including, but not limited to, a long put option and a short call option position.").

purchase and a sale) for purposes of Section 16(b).  (*See* Pl. Opp. 13 ("In their motion for summary judgment, the Moyes do not dispute that the August VPF[C] transaction is treated as a cancellation of the pre-existing VPFs and a Section 16(b) 'purchase' of the underlying shares.")).  The Moyes Defendants do not seriously contest this point, and instead focus their attacks on the second prong of Plaintiff's argument — that the September 2019 VPFC Amendments, which extended the settlement dates and raised both the floor and cap prices of each VPFC, constituted qualifying "sales" under Section 16(b).  (*See id.* (arguing that "entry into a VPF is a 'put equivalent' derivative treated as a 16(b) sale"); *see also id.* at 17-19; Def. Br. 12-19).  In consequence, the Court analyzes whether any of the September 2019 VPFC Amendments was "material" under *Analytical Surveys, Inc.* v. *Tonga Partners LLP*, 684 F.3d 36, 47 (2d Cir. 2012), such that the amendment would be deemed to constitute a simultaneous purchase and sale (sometimes described by courts as a simultaneous cancellation and regrant) of a security, which would then implicate Section 16(b) if the transaction yielded a profit to the insider.

　　As suggested by the overview to this section, the Court's analysis has been hampered by Plaintiff's litigation strategy.  Plaintiff's claims of opportunities for insider abuse are largely *ipse dixit*; in the absence of expert testimony supporting his claims, particularly in light of the exotic securities at issue, the Court is left to rely on the record, learned treatises, and common sense for its analysis of Plaintiff's claims.  What is more, Plaintiff's factual arguments are mutually exclusive:  At times, Plaintiff argues that the Moyes

Defendants benefitted from an insider's perspective that Knight-Swift's stock price would continue to remain depressed. (*See, e.g.*, Pl. Opp. 14 ("By agreeing to the September amendments, the Moyes Defendants put $11.5 million in their pockets while sticking CGMI with contract amendments that they knew were probably worthless."); *id.* at 15 ("If the Moyes Defendants expected Knight-Swift's stock price to stagnate or fall, then the September amendments, and the $11.5 million savings that came with them, were a no-brainer.")).  At other times, however, Plaintiff argues from the premise that the Moyes Defendants' "insider views of Knight-Swift's prospects were favorable." (*Id.* at 2).  Plaintiff cannot have it both ways.[8]

Plaintiff's principal legal argument in this regard, that an "amendment extending the term of a derivative security is generally considered material" (Pl. Opp. 16), is not so much inaccurate as it is incomplete.  In *Analytical Surveys*, the Second Circuit determined that amendments to a derivative security that (i) extended its maturity date *and* (ii) eliminated the requirement that the principal be converted into shares at maturity resulted, for Section 16(b) purposes, in new security.  684 F.3d at 47 ("We consider whether these differences were sufficiently material that the later Note constituted a newly-

---

[8]      Certain of Plaintiff's other arguments confound logic.  Plaintiff suggests, for instance, that the Moyes Defendants are subject to Section 16(b) liability because they elected to amend the VPFCs instead of parting with the pledged shares or covering collateral shortfalls by liquidating other assets.  (*See, e.g.*, Pl. Opp. 1-2 ("The prospect of simply selling 18 million dollars of the more than a billion dollars of collateral and settling the deficiency by writing a check against the proceeds does not seem to have occurred to the Moyes, nor tapping into substantial additional assets."); *id.* at 17 n.1 ("A jury could reasonably infer that the Moyes were not hard up and had other resources from which to fund their shortfall under the Trigger Price Agreement.")).  Quite obviously, Section 16(b) has no means-testing requirement.

issued, rather than amended security.").  The Court identified the relevant question as "whether the changed terms in the 2004 Note gave Tonga a greater opportunity to abuse inside information in short-swing trading at *any* time from acquisition in June 2004 to maturity in January 2006." *Id.*  In concluding in the affirmative, the Court reasoned:

> [T]he changes made from the 2003 Note to the 2004 Note were material.  The changes allowed Tonga more time — from April 2, 2005, when the 2003 Note was to mature, until January 2006 — within which to use inside information in determining whether (and when) to convert the Note into shares; Tonga could, in fact, choose to wait until the maturity date itself to make that call, if need be, because the 2004 Note lacked the mandatory conversion element of the previous Note. Moreover, at maturity, the elimination of that mandatory conversion provision gave Tonga latitude to use inside information to determine whether it could realize a greater return from taking the principal balance in cash or from converting the principal into shares for later sale.

*Id.* at 47-48; *see also Greenberg* v. *Hudson Bay Master Fund*, No. 14 Civ. 5226 (DLC), 2015 WL 2212215, at *9 (S.D.N.Y. May 12, 2015) (concluding in context of motion to dismiss that amendment of convertible notes that eliminated redemption rights, re-set interest rate, and changed maturity date was material).[9]

---

[9]   The Court's research discloses no case in which a court has found that the extension of a derivative security's term alone can constitute a "sale" under Section 16(b).  *See* Romeo & Dye § 3.03 at 315 n.305 (citing *Greenberg* v. *Hudson Bay Master Fund Ltd.*, 2015 WL 2212215, at *9 (S.D.N.Y. May 12, 2015) (convertible notes amended to eliminate redemption rights, reset interest rate, and change maturity date); *Sun River Energy, Inc.* v. *McMillan*, No. 13 Civ. 2456 (SAF), 2014 WL 4771852, at *11-12 (N.D. Tex. Sept. 25, 2014) (parties agreed that amendment to exercise price and expiration date of option was material); *Analytical Surveys, Inc.* v. *Tonga Partners LLP*, 684 F.3d 36, 38 (2d Cir. 2012) (convertible note amended to extend maturity, waive accrued

Since *Analytical Surveys*, courts and commentators have recognized that both the exercise price and the length of a VPFC can serve as "among the most material of its terms."  Romeo & Dye § 3.03 at 317; *accord Analytical Surveys*, 684 F.3d at 47-48; *Rubenstein I*, 492 F. Supp. 3d at 220-21.  That said, while "an amendment to the exercise price of a derivative security *may* be deemed to involve both a sale of the old derivative security and a simultaneous purchase of a new derivative security," Romeo & Dye § 3.03 at 317 (emphasis added), courts have found such amendments to be material for Section 16(b) purposes where the exercise price was *lowered, see Chechele* v. *Ward*, No. 10 Civ. 1286 (VM), 2011 WL 1405244, at *5 (W.D. Okla. Apr. 13, 2011) ("Because the December Amendment reduced the exercise price of the October Warrant, the Court finds that the amendment was material and, thus, resulted in a deemed cancellation of the October Warrant and a regrant of a new warrant."), and not where it was *raised, see Rubenstein I*, 492 F. Supp. 3d at 221, because an increase in the exercise price for certain derivatives would not present the insider with a greater opportunity to abuse inside information.  *See id.* However, no court has considered the materiality *vel non* of an amendment that simultaneously increased the floor and cap prices of the unique VPFC instruments at issue in this case.

Further, and as noted earlier, the Second Circuit has reminded district courts that "[b]ecause Section 16(b) operates regardless of intent and calculates

interest, and eliminate automatic conversion at maturity); *Chechele* v. *Ward*, No. 10 Civ. 1286 (VM), 2011 WL 1405244, at *5 (W.D. Okla. Apr. 13, 2011) (warrant amended to reduce exercise price)).

'profits' in an automatic and non-intuitive way … Section 16(b) is a 'blunt instrument' to be confined within 'narrowly drawn limits.'" *Lowinger* v. *Morgan Stanley & Co.*, 841 F.3d 122, 129 (2d Cir. 2016) (internal citations and footnote omitted). And in deciding the question of whether VPFCs should be treated as traditional or hybrid derivatives, the Second Circuit in *Sperling* declined to reach an outcome that "d[id] not make sense[,]" which in the Court's estimation was an outcome by which "every [VPFC] could subject the insider to section 16(b) liability[.]" *Sperling*, 758 F.3d at 471.

While the facts of *Sperling* differ from the instant case, the Court takes guidance from the Second Circuit's common-sense approach. The Court begins by considering the Moyes Defendants' rights under the VPFCs prior to the September 2019 VPFC Amendments. As discussed above, the actual number of shares deliverable at the Settlement Date of each VPFC depended upon the market price of Knight-Swift shares on that date. If the share price on the Settlement Date was at or below the Floor Price, the Moyes Defendants would be obligated to deliver all of the pledged shares. If, however, the share price on the Settlement Date was between the Floor Price and the Cap Price, or above the Cap Price, the Moyes Defendants would be able to retain some portion of their shares, which shares they would then be free to sell on the open market. Such is the nature of a VPFC. *See, e.g.*, Romeo & Dye § 303 at 271; *Murdock*, 2013 WL 4007565, at *10. Under the VPFCs here, CGMI stood to benefit from any increase in the Knight-Swift share price between what it initially paid and the Floor Price, and any increase in the Knight-Swift share

price above the Cap Price.  Indeed, CGMI certainly understood this in conditioning any increases to the Reset and Termination Trigger Prices on corresponding increases to the Floor and Cap Prices:  As CGMI noted, the combination would "put [CGMI] in the same position as the $18 million, but rather than taking the $18 million in cash [that otherwise would have been the cost to increase the trigger prices], we took 6.5 million in cash and the balance of the 18 million or the 11.5 million we took through modifications to the VPF terms."  (Heathcote Dep. 87:12-19; *see also id.* 87:20-88:8 (outlining "what was needed … to be able for [CGMI] to be more comfortable to only accept 6.5 million")).

The Moyes Defendants, in turn, stood to benefit if the share price on the Settlement Date was between the Floor Price and the Cap Price, insofar as they would be able to retain a portion of the pledged shares to then sell on the open market or to pay a reduced cash settlement price on the Settlement Date.  And while the Moyes Defendants may have stood to lose in the event of a decrease in Knight-Swift's share price, their losses would be capped if and as the price dropped below the floor price or the reference price used to calculate the initial payment made to it by CGMI.  *Cf. Sperling*, 758 F.3d at 466 (noting that "[t]he floor price protected [the insider] from a decline in the stock price because he was required to deliver one million shares (or the cash equivalent) regardless of how much below the floor price the share price fell").

Given the manner in which these VPFCs functioned, it is logical to conclude that an amendment involving a *decrease* in the floor price would be

akin to a sale under Section 16(b), because it could give an insider the ability to get shares back from what it initially pledged if the price settles above the floor.  The lower the floor price, the greater the opportunity to profit from increases in share price.  But where, as here, the amendment increases *both* floor and cap prices, it decreases the likelihood that the insider could abuse inside information, and thus should not be considered "material."

The September 2019 VPFC Amendments prove the point:  At the time the Moyes Defendants entered into the amendments, Knight-Swift's stock price was below each of the VPFCs' Floor Prices.  (*See* Def. 56.1 ¶ 37).  In other words, the Moyes Defendants were playing catch-up from the start, inasmuch as any increases between the transaction-date stock price and the floor price would not reduce the number of shares due to CGMI at settlement.  By increasing the Floor Price of the VPFCs, the September 2019 VPFC Amendments only lengthened the catching-up period.  Indeed, by raising the Floor Prices, the Amendments made it more likely, both statistically and on this record, that Knight-Swift's share price at the time of settlement would be below the Floor Price, and that the Moyes Defendants would have to relinquish all of the pledged shares.  More broadly, by raising both Floor and Cap Prices from those set in August 2019, the Amendments reduced the Moyes Defendants' opportunities to benefit from share prices above the Floor Prices.[10]

---

[10]     The structure of the September 2019 VPFC Amendments thus distinguish this case from the few cases in which the amendment involved the negotiation of a *decrease* in the floor price.  *See Ward*, 2011 WL 1405244, at *5 ("Because the December Amendment reduced the exercise price of the October Warrant, the Court finds that the

In short, because the September 2019 VPFC Amendments increased both Floor and Cap Prices, and because those increases did not provide an increased opportunity for insider abuse, the Court concludes that they were not sufficiently "material" to be deemed sales under Section 16(b).[11]

The Court's conclusion is only bolstered when it considers the September 2019 VPFC Amendments in tandem with (and as cabined by) the TPA:

| Instrument | Lowest Floor or Trigger Price |
|---|---|
| February 2019 VPFCs | $35.9841 |
| August 2019 VPFCs | $42.00 |
| TPA | Reset Trigger: $36.75<br>Early Termination Trigger: $39.70 |
| September 2019 VPFCs | $43.20 |
| TPA Trigger Raise | Reset Trigger: $37.85<br>Early Termination Trigger: $40.70 |

(Def. 56.1 ¶¶ 18, 32; Pl. 56.1 ¶¶ 18, 45).  Under the terms of the TPA, any potential gain the Moyes Defendants could have received would have been offset by the terms of the TPA, whose Reset and Early Termination Trigger

---

amendment was material and, thus, resulted in a deemed cancellation of the October Warrant and a regrant of a new warrant"); *see also* Romeo & Dye § 3.03 at 317 (discussing decreases to prices of convertible securities).  Plaintiff cites to one case from the Northern District of Texas that involved amendments to an option that extended the settlement date, while both increasing and decreasing the strike price.  *See Sun River*, 2014 WL 4771852, at *11-12.  There, because both parties agreed that the amendments were material, the court deemed the amendments "a redemption of the old security and grant of a new security for purposes of Section 16," and thus a simultaneous purchase and sale under the statute.  *Id.* at *12 (quoting *Analytical Surveys*, 684 F.3d at 47 n.17 (internal citation omitted and alteration adopted)).  More pointedly, the option at issue was entirely dissimilar, in substance and in function, to the VPFCs in this case.

[11]   The Court acknowledges that the increase in Cap Prices would have given the Moyes Defendants an increased upside potential when compared with the VPFC terms in August 2019.  However, Knight-Swift's stock would have had to substantially outperform its then-current trading prices.  (*See* Joint Stipulation, Ex. B).  The infinitesimal possibility of that event happening does not suffice to raise the specter of insider abuse.

Prices at best restored any benefits the Moyes Defendants would receive from increased share prices to the pre-amendment status quo.[12]

As Defendants argue, the TPA functioned as a barrier to any potential profit by the Moyes Defendants if the share price were to increase — akin, but not identical, to an "up-and-out barrier put," a derivative even rarer than a VPFC. (*See* Def. Br. 23 (quoting Marcus Report ¶ 31)). "An up-and-out put is a put option that ceases to exist when a barrier … that is greater than the current asset price is reached." JOHN C. HULL, *Exotic Options*, *in* OPTIONS, FUTURES, AND OTHER DERIVATIVES 605 (9th ed. 2015).[13] Although not technically an up-and-out barrier put, the TPA here operated similarly, vitiating the benefits of the put option in the VPFCs by setting forth interim trigger prices (effectively sub-Floor Prices), that the Moyes Defendants would need to pay in order to avoid default and the consequent loss of all shares pledged under the VPFCs as share prices rose. (TPA § 2(a); *see also* Pernick Decl., Ex. 4 at 9 ("As the [Knight-Swift] share price approaches the Early Termination Price, Jerry [Moyes] will be required to contribute cash to reset the Early Termination Price higher (or Citi has the option to terminate and take the underlying shares).")).

---

[12]   Plaintiff does not assert that the Moyes Defendants' entry into the TPA constituted a qualifying transaction under Section 16(b).  No shares were pledged under the TPA; instead, the TPA was put in place to compensate CGMI for the $18,602,000 it paid to Citibank under the Citi Release and Termination Agreement without the Moyes Defendants needing to put up additional cash or shares.  (*See* Pernick Decl., Ex. 4 at 9).

[13]   The Hull treatise is one of the leading authorities regarding exotic options like the ones at issue here.  *See, e.g.*, *FIH, LLC* v. *Foundation Capital Partners LLC*, 920 F.3d 134, 141 n.8 (2d Cir. 2019) (citing Hull to define Delta hedging); *Caiola* v. *Citibank, N.A., New York*, 295 F.3d 312, 317 (2d Cir. 2002) (same).

36

The foregoing analyses focus on the potential for insider abuse in the eventuality of gains in Knight-Swift's share price.  To the extent, however, that Plaintiff is suggesting that the potential for insider abuse was at the other end of the spectrum (*see* Pl. Opp. 14 ("If the Moyes expected Knight-Swift's stock price to fall over the next six months, then they lost nothing by agreeing to the September amendments.")), the Court agrees with the Moyes Defendants' assessment that such an argument:

> makes no sense.  In actuality, it would have been brainless for anyone to pay $6,500,000 in order to avoid seizure 29,467,003 shares of stock that were expected to decline in value or even stay flat.  Logic dictates that, in Plaintiff's hypothetical scenario, the Moyes Defendants would have kept their money and let CGMI take the shares, which is what inevitably would happen at maturity in any event under Plaintiff's scenario.

(Def. Reply 10).

The Court ends its Section 16(b) analysis where it began, by considering the historical perspective.  In 1991, the SEC amended its rules relating to Section 16(b) "in order to clear up uncertainties as to how that section applies to derivative securities, including options."  *Magma Power Co.,* 136 F.3d at 321.  The resulting amendments were motivated by the concern that "unless this functional equivalence were recognized and accounted for, insiders could evade disgorgement of short-swing profits simply by buying call options and selling the underlying stock, or buying underlying stock and buying put options."  *Id.* (internal quotations marks and citation omitted).  But such concerns simply are not present in the context of the September 2019 VPFC Amendments, where the only party who stood to gain if the stock price went up (at least

between the share price and any floor price) was CGMI, and where the rational

course of action if the stock price went down was to allow the VPFCs to

terminate, and not to continue to throw good money after bad.  To accept

Plaintiff's arguments for liability would require the Moyes Defendants to have

run a gauntlet created by the various floor, cap, and trigger prices specified by

the VPFCs and the TPA.  Being insiders would not have been sufficient; the

Moyes Defendants would also have had to be psychic.  In short, the record

discloses no opportunity for the Moyes Defendants to abuse their positions as

insiders when they entered into the September 2019 VPFC Amendments, and

the Court accordingly finds that the amendments do not qualify as Section

16(b) sales.  Further, because Plaintiff has not presented a triable issue with

respect to this element of his Section 16(b) claim, the Court grants summary

judgment in favor of the Moyes Defendants.

## C.    The Court Denies Plaintiff's *Daubert* Motion

Plaintiff cross-moves to exclude the expert testimony of Dr. David Marcus

under *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Principally, Plaintiff challenges Dr. Marcus's methodology of computing the

Moyes Defendants' profit as improper pursuant to the Second Circuit's

decisions in *Smolowe* v. *Delendo*, 136 F.2d 231 (2d Cir. 1943), *cert. denied*, 320

U.S. 751 (1943), and *Gratz* v. *Claughton*, 187 F.2d 46, 48 (2d Cir. 1951), *cert.*

*denied*, 341 U.S. 920 (1951).  (Pl. Opp. 2-11, 19-21; Pl. Reply 2-10).

Secondarily, Plaintiff challenges Dr. Marcus's qualifications to issue the

Marcus Report.  (Pl. Opp. 7, 9-11).  Given its resolution of Plaintiff's Section

16(b) arguments, the Court has only considered the background section of the Marcus Report; it denies Plaintiff's motion outright with respect to that section, and it denies the motion as moot with respect to the remainder of the Report.

### 1.   Applicable Law

The Supreme Court has tasked district courts with a "gatekeeping" role with respect to expert opinion testimony. *Daubert*, 509 U.S. at 597 (holding that it is the district court's responsibility to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand"). This "gatekeeping" function applies whether the expert testimony is based on scientific, or on technical or "other specialized" knowledge. *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 141 (1999). "It is well-established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]" *Boucher* v. *U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks and citation omitted).

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  A court's inquiry under Rule 702 focuses on three issues:
(i) whether the witness is qualified to be an expert; (ii) whether the opinion is
based upon reliable data and methodology; and (iii) whether the expert's
testimony on a particular issue will assist the trier of fact.  *Nimely* v. *City of
New York*, 414 F.3d 381, 396-97 (2d Cir. 2005).  "[T]he proponent of expert
testimony has the burden of establishing by a preponderance of the evidence
that the admissibility requirements of Rule 702 are satisfied[.]"  *United States* v.
*Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

> ### 2.    Discussion

Dr. Marcus occupies a senior role at Cornerstone Research, an economic
and financial consulting firm.  (Marcus Report ¶ 1).  He holds a B.A. in
Business Administration and a Ph.D. in finance.  (*Id.*).  His *curriculum vitae*
details his extensive teaching and consulting experience on the subjects of
corporate finance, the financial markets, and securities, including derivative
securities.  (*Id.*, Appendix A).  The Court qualifies him as an expert on those
topics.

Dr. Marcus's report is divided into two sections: (i) a background section
discussing the securities and the securities transactions at issue and (ii) a
valuation analysis as of, and on account of, the August 2019 VPFC
Transactions and September 2019 VPFC Amendments.  (Marcus Report).  To
the extent that Plaintiff's submissions could be read to challenge Dr. Marcus's
expertise to present background information regarding the securities and the
transactions at issue (*see, e.g.*, Pl. Opp. 7-8), the Court denies Plaintiff's motion

to exclude.  In light of the "liberal thrust" of the Federal Rules of Evidence,
*Daubert,* 509 U.S. at 588, courts in this Circuit have noted that an "expert
should not be required to satisfy an overly narrow test of his own
qualifications." *Johnson & Johnson Vision Care, Inc.* v. *CIBA Vision Corp.,*
No. 04 Civ. 7369 (LTS), 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006)
(internal quotation marks and citation omitted).  "If the expert has educational
and experiential qualifications in a general field closely related to the subject
matter in question, the court will not exclude the testimony solely on the
ground that the witness lacks expertise in the specialized areas that are
directly pertinent." *In re Zyprexa Prod. Liab. Litig.,* 489 F. Supp. 2d 230, 282
(E.D.N.Y. 2007) (citing *Stagl* v. *Delta Air Lines, Inc.,* 117 F.3d 76, 82 (2d Cir.
1997) (concluding that expert witness was qualified when experience,
knowledge, or training related to general area, not to specific question before
trier of fact)).  Indeed, "[i]n considering a witness's practical experience and
educational background as criteria for qualification, the only matter the court
should be concerned with is whether the expert's knowledge of the subject is
such that his opinion will likely assist the trier of fact in arriving at the
truth." *Johnson & Johnson Vision Care, Inc.,* 2006 WL 2128785, at *5 (internal
quotation marks and citation omitted).[14]  Because the Court finds that Dr.

---

[14]    A sister court in this District has even observed that "at times, 'well-trained people with
somewhat more general qualifications' are *better* suited to testify to industry practices
and customs than are experts qualified with a high 'degree of specificity,' but who may
have an insular perspective." *McBeth* v. *Porges,* No. 15 Civ. 2742 (JMF), 2018 WL
5997918, at *6 (S.D.N.Y. Nov. 15, 2018) (quoting *Stagl* v. *Delta Air Lines, Inc.,* 117 F.3d
76, 82 (2d Cir. 1997)).

Marcus is qualified as an expert on subject matters of corporate finance, the financial markets, and securities, any "[d]isputes as to the strength of his credentials ... go to the weight, not the admissibility, of his testimony." *McCullock* v. *H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

To the extent that Plaintiff is challenging Dr. Marcus's valuation of the effects of the August 2019 VPFC Transactions and September 2019 VPFC Amendments, the Court has not considered that portion of his report, and thus denies Plaintiff's motion as moot. The Court notes, however, that "[f]or nearly eighty years, the Second Circuit has adhered to the lowest-in, highest-out method of calculating profits in Section 16(b) cases ... citing the 'broadly remedial' purpose of the statute." *Chechele* v. *Standard Gen. L.P.*, No. 20 Civ. 3177 (KPF), 2022 WL 766244, at *6 (S.D.N.Y. Mar. 14, 2022) (internal quotation marks and citations omitted). Under this method, "[p]rofit is computed by matching the highest sale price with the lowest purchase price within six months, the next highest sale price with the next lowest purchase price within six months, and so on, until all shares have been included in the computation." Romeo & Dye § 12.02 at 1227 (internal citation omitted).

As this Court has previously opined, "[t]he validity of this justification is open to debate, given the quasi punitive effect of the method and the existence of other remedies for insider trading violations not contemplated at the time Section 16(b) was enacted in 1934." *Standard Gen. L.P.*, 2022 WL 766244, at *6 (quoting Romeo & Dye § 12.02 at 1236). Indeed, "[t]he lowest-in, highest-out method can result in an award substantially greater than the actual profits

on multiple short-swing transactions[,]" Romeo & Dye § 12.02 at 1227, much like Plaintiff has calculated for the challenged transactions here.  While the Moyes Defendants claim only to have suffered losses (*see* Marcus Report), Plaintiff posits that the Moyes Defendants personally benefitted from the challenged transactions in an amount between $11.5 million and $18 million (*see* Pl. Opp. 14, 17).  However, employing the Second Circuit's methodology, Plaintiff calculates a "profit" of $152,049,735.48.  (*Id.* at 20-21).  Judge Hand was aware of this "crushing" fact, but noted that it should "certainly serve as a warning, and may prove a deterrent."  *Gratz*, 187 F.2d at 52.  In other words, the possibility of outsized disgorgement figures is a feature, and not a bug, of the Second Circuit's methodology.

Indeed, while critics note that such a construction "ignore[s] economic reality," *Segen ex rel. KFx Inc.* v. *Westcliff Cap. Mgmt., LLC,* 299 F. Supp. 2d 262, 270 (S.D.N.Y. 2004) (discussing one side's argument against the method), "the undeniable fact is that the lowest-in, highest-out method is so firmly ingrained in the fabric of Section 16(b) that there is virtually no chance a court will deviate from it in the absence of a statutory or rule change to the contrary," *Standard Gen. L.P.*, 2022 WL 766244, at *6 (quoting Romeo & Dye § 12.02 at 1236); *see also* SEC Release No. 34-26333, 53 Fed. Reg. 49997, 50009 (Dec. 13, 1988) (prioritizing "benchmarks or rules of thumb to be applied in short-swing transactions involving derivative securities").

Had this Court found a violation of Section 16(b) in this case, it would have argued for reconsideration of this methodology in light of Plaintiff's

calculations. *But cf. Unicorn Bulk Traders Ltd.* v. *Fortune Mar. Enterprises, Inc.*, No. 08 Civ. 9710 (PGG), 2009 WL 125751, at *2 (S.D.N.Y. Jan. 20, 2009) ("This Court is bound to follow controlling Second Circuit precedent unless that precedent is overruled or reversed — even if, as here, the precedent has been criticized by scholars and certain courts in other Circuits.")). Because the Court finds no violation, it denies as moot Plaintiff's motion to exclude this portion of the Marcus Report.

## CONCLUSION

In light of the foregoing, Defendants' motion for summary judgment is GRANTED, and Plaintiff's cross-motion to exclude is DENIED IN PART and DENIED AS MOOT IN PART.[15] The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:    March 28, 2023
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

---

[15]    Plaintiff has not opposed the Moyes Defendants' request that the Court's judgment reflect that Plaintiff's "Third (Reserved) Claim for Relief" (Dkt. #25 at ¶ 44), alleged as "a precaution against possible error of detail attributable to inaccuracies in the public record" and meant to "reserve[] Plaintiff's right to assert claims based on the discovery of additional trades," is dismissed along with this action. (*See* Def. Br. 25 n.5 (making this request of the Court); Def. Reply 4 n.3 (correctly noting that Plaintiff did not oppose)). *See Felske* v. *Hirschmann*, No. 10 Civ. 8899 (RMB), 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) ("A plaintiff effectively concedes a defendant's arguments by his failure to respond to them."). As such, this claim is dismissed.